461 S.E.2d 163

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Dale Edward GUTHRIE, Defendant Below, Appellant.**

No. 22710.

Supreme Court of Appeals of West Virginia.

Submitted May 10, 1995.

Decided July 19, 1995.

Concurring Opinion of Justice Workman, July 21, 1995.

**665**

Mary Beth Kershner, Asst. Pros. Atty., Charleston, for appellee.

Stephen D. Warner, Deputy Public Defender, Charleston, for appellant.

CLECKLEY, Justice:

The defendant, Dale Edward Guthrie, appeals the January, 1994, jury verdict of the Circuit Court of Kanawha County finding him guilty of first degree murder. In May of 1994, the defendant was sentenced to serve a life sentence with a recommendation of mercy. The defendant cites as error several instructions given to the jury and improper questions and comments made by the prosecutor. Cumulative error is asserted. He also contends there is insufficient evidence to support the verdict.

## I.

### FACTS AND PROCEDURAL BACKGROUND

It is undisputed that on the evening of February 12, 1993, the defendant removed a knife from his pocket and stabbed his co-worker, Steven Todd Farley, in the neck and killed him. The two men worked together as dishwashers at Danny's Rib House in Nitro and got along well together before this incident. On the night of the killing, the victim, his brother, Tracy Farley, and James Gibson were joking around while working in the kitchen of the restaurant. The victim was poking fun at the defendant who appeared to be in a bad mood. He told the defendant to "lighten up" and snapped him with a dishtowel several times. Apparently, the victim had no idea he was upsetting the defendant very much. The dishtowel flipped the defendant on the nose and he became enraged.

The defendant removed his gloves and started toward the victim. Mr. Farley, still teasing, said: "Ooo, he's taking his gloves off." The defendant then pulled a knife from his pocket and stabbed the victim in the neck. He also stabbed Mr. Farley in the arm as he fell to the floor. Mr. Farley looked up and cried: "Man, I was just kidding around." The defendant responded: "Well, man, you should have never hit me in my face." The police arrived at the restaurant and arrested the defendant. He was given his *Miranda* rights. The defendant made a statement at the police station and confessed to the killing.[1] The police officers

1. The confession, which was read to the jury, stated, in part:

"I arrived at work, at 4:00 o'clock, and was looking forward to another evening of work, I was looking forward to it, because I do enjoy working at Danny's Rib House. Upon my arrival at work I immediately observed the verbal and physical aggression of Mr. Farley. During the evening of work I heard him calling certain employee's 'Boy' and during the evening he referred to me as 'Boy' many times, I did and said nothing, continuing my work, letting it pass. He was really loud, and obnoxious, as I'm sure many employee's noticed. As the evening was coming to a close Mr. Farley walked very close by me and said 'that I had an "attitude problem." ' It was verbal, I let it pass, continuing my work. After bringing some dishes to the cook, I walked back to the dishwasher to begin drying off some dishes, Mr. Farley approached me and made a sarcastic comment about me being a quiet person, he walked ever closer, to me until he was in my face, as I was trying to carry out my responsibilities. After all these things were said, and even though he was exhibiting physical aggres-

sion by coming up to my face, and putting forth what I interpreted to be a challenge, again I did nothing, continuing to carry out my responsibilities. Standing a few inches from my face he took his wet dishrag and hit me once, on the forearm, I did nothing continuing my work. Standing in the same area, he hit me again on the forearm, obviously wanting a confrontation, I gave him none, continuing my work. Standing in the same place he hit me, hard, two times in the face, it really hurt, it was soaking wet, and it stung, as he brought it to bear upon my face, at that moment I thought he was going to go further and hit me, so I reached in my right pants pocket, and retrieved my lock blade knife, that I use for skinning rabbits and squirrells [sic] during hunting season. I swung at Mr. Farley with my right hand in which was my knife, he backed up, so I didn't swing twice, he slowly sunk to [the] floor, I ran to the front of the restaurant and yelled out, call the ambulance. All I came to work for, was to work, and carry out my obligations, having ill will toward no one, and I still have none, but I feel I had the

described him as calm and willing to cooperate.

It is also undisputed that the defendant suffers from a host of psychiatric problems. He experiences up to two panic attacks daily and had received treatment for them at the Veterans Administration Hospital in Huntington for more than a year preceding the killing. He suffers from chronic depression (dysthymic disorder), an obsession with his nose (body dysmorphic disorder), and borderline personality disorder. The defendant's father shed some light on his nose fixation. He stated that dozens of times a day the defendant stared in the mirror and turned his head back and forth to look at his nose. His father estimated that 50 percent of the time he observed his son he was looking at his nose. The defendant repeatedly asked for assurances that his nose was not too big. This obsession began when he was approximately seventeen years old. The defendant was twenty-nine years old at the time of trial.

The defendant testified he suffered a panic attack immediately preceding the stabbing. He described the attack as "intense"; he felt a lot of pressure and his heart beat rapidly. In contrast to the boisterous atmosphere in the kitchen that evening, the defendant was quiet and kept to himself. He stated that Mr. Farley kept irritating him that night. The defendant could not understand why Mr. Farley was picking on him because he had never done that before. Even at trial, the defendant did not comprehend his utter overreaction to the situation. In hindsight, the defendant believed the better decision would have been to punch out on his time card and quit over the incident. However, all the witnesses related that the defendant was in no way attacked, as he perceived it, but that Mr. Farley was playing around. The defendant could not bring himself to tell the other workers to leave him alone or inform them about his panic attacks.

In contrast to his written statement, the defendant testified he was unable to recall stabbing the victim. After he was struck in the nose, he stated that he "lost it" and,

when he came to himself, he was holding the knife in his hand and Mr. Farley was sinking to the floor.

A psychiatrist, Dr. Sidney Lerfald, testified on behalf of the defendant. He diagnosed the various disorders discussed above. Dr. Lerfald felt the defendant's diagnoses "may have affected his perception somewhat." Nevertheless, it was his opinion the defendant was sane at the time of the offense because he was able to distinguish between right and wrong and could have conformed his actions accordingly.

It was the State's position that the facts supported a first degree murder conviction. At the close of the State's case-in-chief, the defense moved for a directed verdict contending the State failed to present evidence of malice and premeditation. This motion was denied. The defense argued the facts of the case supported voluntary manslaughter or, at worse, second degree murder. The jury returned a verdict finding the defendant guilty of first degree murder with a recommendation of mercy.

## II.

## DISCUSSION

In his appeal, the defendant raises several assignments of error: (1) whether the evidence was sufficient to support the verdict; (2) whether the trial court erred in giving instructions covering first degree murder; (3) whether the trial court erred in refusing to give defendant's instruction on circumstantial evidence; (4) whether the trial court erred in permitting the prosecution to argue the penalties of each lesser-included offense; (5) whether the trial court erred in permitting the prosecution to inject irrelevant evidence of racial, gender, and political prejudices in the case; and (6) whether reversal is required under the cumulative error rule. At the outset, we find some of the errors asserted by the defendant are without merit. Therefore, our review of this case will be limited to the three areas discussed below.

right to respond, finally, to this act of aggression that was perpetrated against me, I do not

exhibit aggressive, violent behavior but I felt I had no alternative, or recourse."

## A.

### Sufficiency of the Evidence

First, the defendant strives to persuade us that the record in this case does not support the verdict of guilty of first degree murder beyond a reasonable doubt. Because this exhortation challenges the sufficiency of evidence to support a jury's verdict, our authority to review is limited.

We have not addressed the criminal standard of review concerning the sufficiency of evidence since 1978. Syllabus Point 1 of *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978), states our rule with respect to such a claim:

> "In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done."

**2.** *Rehearing denied by* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979).

**3.** There is some question as to whether *Jackson* reflects the current thinking of the United States Supreme Court. In the practical context, *Jackson* was a five-to-three decision; every member of the majority is gone from the Supreme Court; and the concurring trio, Justice Stevens joined by Chief Justice Burger and Justice Rehnquist, argued for a standard that asked whether there was *some* evidence to support the disputed finding. Since both opinions in *Jackson* held the evidence was adequate to convict, the choice between the two calibrations of the standard did not matter in that case. Also, neither of the two sequels to *Jackson* is illuminating. *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (the majority opinion by Chief Justice Rehnquist capsulized *Jackson* solely in order to distinguish it); *Wright v. West*, 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (involved a fractured Supreme Court with no majority opinion).

While we are not certain as to how the United States Supreme Court will ultimately resolve this issue, the majority position in *Jackson* represents the pole most favorable to the defendant, and this stated position of the majority of justices has never been overruled. Accordingly, we proceed

A year after *Starkey* was decided, the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979),[2] articulated, at least linguistically, a different standard of review under the United States Constitution.[3] In a sufficiency of the evidence claim under *Jackson*, an appellate court, while reviewing the record in the light most favorable to the prosecution, must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573. (Emphasis in original).

After contrasting *Starkey* and its progeny with the standard of review announced in *Jackson*, we believe it is desirable to reconcile our differences and to adopt the federal standard of review both as to *Jackson* generally and as to the standard of review in circumstantial evidence cases.[4] By doing so, however, we continue a highly deferential approach: Appellate courts can reverse only if no rational jury could have found the defendant guilty beyond a reasonable doubt.[5] This standard is a strict one; a

to consider whether on the record made in the trial court *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

**4.** The reconciliation that we choose to do is consistent with a similar approach we took in *State v. Kopa*, 173 W.Va. 43, 49, 311 S.E.2d 412, 418 (1983), where we observed that adopting a different standard in criminal cases might "create the problem of sustaining convictions in the state court with predictable release through habeas corpus in the federal court." Although the two standards would not necessarily lead to different results, we believe it is unnecessary to have a criminal defendant subjected to different standards of review should the case ultimately end up in federal court. *See York v. Tate*, 858 F.2d 322 (6th Cir.1988), *cert. denied*, 490 U.S. 1049, 109 S.Ct. 1960, 104 L.Ed.2d 428 (1989).

**5.** While the language in *Jackson* seems to support a *de novo* review, *see* 443 U.S. at 324–26, 99 S.Ct. at 2792–93, 61 L.Ed.2d at 577–78, the review is only *de novo* as to decisions made by the trial court. As to the jury's verdict, we are required to review all inferences in favor of the verdict, thus making deferential review appropriate.

defendant must meet a heavy burden to gain reversal because a jury verdict will not be overturned lightly.

Under the *Jackson* standard, when reviewing a conviction, we may accept any adequate evidence, including circumstantial evidence, as support for the conviction. It is possible that we, as an appellate court, may have reached a different result if we had sat as jurors. However, under *Jackson*, it does not matter how we might have interpreted or weighed the evidence. Our function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

In adopting *Jackson*, we necessarily overturn our long established rule that when the State relies upon circumstantial evidence, in whole or in part, for a court to sustain the verdict all other *reasonable* hypotheses need be excluded by the prosecution save that of guilt. In *State v. Noe*, 160 W.Va. 10, 15, 230 S.E.2d 826, 829–30 (1976), we stated:

"[C]ircumstantial evidence will not support a guilty verdict unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which create a mere suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction."

*State v. Robinette*, 181 W.Va. 400, 383 S.E.2d 32 (1989); *State v. Dobbs*, 163 W.Va. 630, 259 S.E.2d 829 (1979). In *State v. Frasher*, 164 W.Va. 572, 265 S.E.2d 43 (1980), however, we recognized the application of this rule is limited to cases where the State relied wholly upon circumstantial evidence. *See* Syl. pt. 3, *State v. McHenry*, 93 W.Va. 396, 117 S.E. 143 (1923).

However, under *Jackson*, the mere existence of other reasonable hypotheses is not enough to reverse a jury verdict. This new circumstantial evidence rule that we adopt today originated in *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150, 166 (1954), where the United States Supreme Court stated:

"The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other that that of guilt. There is some support for this type of instruction in the lower court decisions, ... but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect...."

"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some case point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." (Citations omitted).

The circumstantial evidence rule of *Holland* was reaffirmed in *Jackson:*

"Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past.... We decline to adopt it today." 443 U.S. at 326, 99 S.Ct. at 2792–2793, 61 L.Ed.2d at 578. (Citation omitted).

Facing the same dilemma, the Supreme Court of Ohio also abandoned the requirement that in circumstantial evidence cases the prosecution's evidence need exclude all other reasonable hypotheses of innocence. In *State v. Jenks*, 61 Ohio St.3d 259, 272, 574

N.E.2d 492, 502 (1991),[6] relying on the language in *Holland,* the Ohio court stated:

> "Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence. Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of a factfinder."

These precedents illuminate our path. We find the logic and analysis of *Holland* and *Jenks* to be forceful. Therefore, we hold there should be only one standard of proof in criminal cases and that is proof beyond a reasonable doubt. We start along this route by acknowledging that there is no qualitative difference between direct and circumstantial evidence.[7] Thus, it follows *a fortiori* that once a proper instruction is given advising the jury as to the State's heavy burden under the guilt beyond a reasonable doubt standard, an additional instruction on circumstantial evidence is no longer required even if the State relies wholly on circumstantial evidence.[8]

In summary, a criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. As we have cautioned before, appellate review is not a device for this Court to replace a jury's finding with our own conclusion. On review, we will not weigh evidence or determine credibility.[9] Credibility determinations are for a jury and not an appellate court. On appeal, we will not disturb a verdict in a criminal case unless we find that reasonable minds could not have reached the same conclusion. Finally, a jury verdict should be set aside only when the record contains no evi-

---

6. *Rehearing denied by* 62 Ohio St.3d 1410, 577 N.E.2d 362 (1991).

7. *See State v. Bailey,* 151 W.Va. 796, 155 S.E.2d 850 (1967).

8. Our conviction that the *Holland* rule is the better rule is not weakened by the fact that there is substantial conflict among the states as to whether the standard announced in *Noe* is preferable to that of *Holland.* According to our rough count, for states following the *Noe* rule, see *Ex parte Williams,* 468 So.2d 99 (Ala.1985); *Smith v. State,* 282 Ark. 535, 669 S.W.2d 201 (1984), *cert. denied,* — U.S. —, 113 S.Ct. 1331, 122 L.Ed.2d 716 (1993); *Murdix v. State,* 250 Ga. 272, 297 S.E.2d 265 (1982); *State v. Lilly,* 468 So.2d 1154 (La.1985); *State. v. Andrews,* 388 N.W.2d 723 (Minn.1986); *State v. Easley,* 662 S.W.2d 248 (Mo.1983); *State v. Williams,* 657 S.W.2d 405 (Tenn.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); *State v. John,* 586 P.2d 410 (Utah 1978); *State v. Wyss,* 124 Wis.2d 681, 370 N.W.2d 745 (1985). For states rejecting the *Noe* rule, see *Des Jardins v. State,* 551 P.2d 181 (Alaska 1976); *State v. Harvill,* 106 Ariz. 386, 476 P.2d 841 (1970); *Henry v. State,* 298 A.2d 327 (Del.1972); *State v. Bush,* 58 Haw. 340, 569 P.2d 349 (1977); *Gilmore v. State,* 275 Ind. 134, 415 N.E.2d 70 (1981); *State v. Morton,* 230 Kan. 525, 638 P.2d 928 (1982); *State v. Cowperthwaite,* 354 A.2d 173 (Me.1976); *Finke v. State,* 56 Md.App. 450, 468 A.2d 353 (1983), *cert. denied,* 299 Md. 425, 474 A.2d 218 (Md.1984), *cert. denied sub nom. Finke v. Maryland,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984); *People v. Johnson,* 146 Mich.App. 429, 381 N.W.2d 740 (1985); *State v. Buchanan,* 210 Neb. 20, 312 N.W.2d 684 (1981); *State v. Jones,* 303 N.C. 500, 279 S.E.2d 835 (1981); *State v. Stokes,* 299 S.C. 483, 386 S.E.2d 241 (1989).

9. An appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact. *State v. Bailey, supra.* It is for the jury to decide which witnesses to believe or disbelieve. Once the jury has spoken, this Court may not review the credibility of the witnesses.

dence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent with our decision announced today, they are expressly overruled. With the scope of our review thus defined, we move to the defendant's claims.

■■■ We begin by emphasizing that our review is conducted from a cold appellate transcript and record. For that reason, we must assume that the jury credited all witnesses whose testimony supports the verdict. The essential facts of this case—those that the jury was unquestionably entitled to find—are rather simple: The defendant became irritated with the "horseplay" of the victim; when the victim in jest hit the defendant with a wet dishtowel on his nose, the defendant became angry and drew a four-inch-long lock blade knife from his pocket and stabbed the victim fatally in the neck. After the defendant was confronted with his deed, he made a statement that could be interpreted to mean he was not remorseful but, to the contrary, was unconcerned about the welfare of the victim.[10] In addition to the jury hearing testimony from eyewitnesses to the killing, the defendant confessed.

There is no doubt what inferences and findings of fact the jury had to draw in order to convict the defendant of first degree murder. The jury must have believed that: (1) The "horseplay" provocation was not sufficient to justify a deadly attack; (2) the defendant was under no real fear of his own from being attacked; (3) the stabbing was intentional; and (4) the time it took the defendant to open his knife and inflict the mortal wound was sufficient to establish premeditation.[11]

■■■ The difficult factual question must have been the mental state of the defendant at the time of the stabbing. The evidence was somewhat conflicting on this point. While the evidence offered by the defendant is not impossible to believe, some of his explanations seem unlikely. Guilt beyond a reasonable doubt cannot be premised on pure conjecture. However, a conjecture consistent with the evidence becomes less and less conjecture and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely. The beyond a reasonable doubt standard does not require the exclusion of every other hypothesis or, for that matter, every other *reasonable* hypothesis. It is enough if, after considering all the evidence, direct and circumstantial, a reasonable trier of fact could find the evidence established guilt beyond a reasonable doubt.

■■ After reviewing the record, this Court has some doubt as to whether this is a first degree murder case; but, at this point, *Jackson*'s own objective standard turns against the defendant. It makes absolutely no difference whether we on the appellate bench as jurors would have voted to convict the defendant of a lesser-included offense or whether we would have thought there was some reasonable doubt. To the contrary, the question posed by *Jackson* is whether any rational jury could on the evidence presented think the defendant premeditated and intentionally killed the victim. We do not find the evidence so weak as to render the verdict irrational. A rational jury may well have found the defendant guilty of some lesser-included crime without violating its oath; but, drawing all favorable inferences in favor of the prosecution, a rational jury could also convict. We end by suggesting that varia-

---

10. On cross-examination, the prosecuting attorney asked the defendant if, upon learning of the victim's death, he replied to the police officer: "That's too bad, buddy. Do you think it'll snow?" This Court does not suggest this evidence should have been admitted. However, when reviewing a sufficiency of the evidence claim, an appellate court is entitled to review all the evidence that was actually admitted rightly or wrongly. *See Lockhart v. Nelson,* 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988).

11. The evidence shows the victim's actions were irritating to the defendant well before the stabbing took place. His anger was building with each comment and flip of the towel. Furthermore, witnesses testified the defendant attempted to stab the victim a second time as he fell to the ground. The evidence shows the victim was slashed in the arm during this attempt. Finally, the defendant's statement that he "had the right to respond, finally, to this act of aggression that was perpetrated against [him]" is considered probative evidence of premeditation and deliberation.

tions in human experience suggest it is not unexpected to see a considerable range of reasonable verdicts or estimates about what is likely or unlikely. Thus, we find the evidence sufficient under either the *Jackson* or the *Starkey* standard.

## B.

### *Jury Instructions*

The principal question before us under this assignment of error is whether our instructions on murder when given together deprive a criminal defendant of due process or are otherwise wrong and confusing. Because the instructions given in this case conform to what we have already approved in this area, the essence of what the defendant asks us to decide is whether our previously approved instructions in first degree murder cases are legally correct. In concluding his presentation, the defendant asks us "to write an opinion which clearly and specifically defines (1) the term wilful, (2) the term deliberate, and (3) the term premeditated."

The jury was charged in this case on the offenses of first and second degree murder and the lesser-included offenses of voluntary and involuntary manslaughter. These instructions were consistent with the law developed in past decisions. The defendant virtually concedes there is no available affirmative defense, other than an argument for the lesser-included offense of voluntary manslaughter. Because of the unavailability of self-defense or insanity, the defendant contends "the precise definitions of these terms is [*sic*] critical." We will review the various arguments of the defendant in turn.

### 1. Standard of Review

■■■ The extent of the grounds for defense counsel's objection to the challenged

instructions is not entirely clear from the record. The objection could be construed as a challenge to the trial court's inclusion of certain instructions as a matter of law. Alternatively, the objection could be read as a challenge merely to the confusing nature of the instructions. The basis of the objection determines the appropriate standard of review.[12] Giving the defendant the benefit of the doubt, we will consider the issue first as a review of the legal propriety of the instructions. In this light, if an objection to a jury instruction is a challenge to a trial court's statement of the legal standard, this Court will exercise *de novo* review.[13] More recently, we stated in *State v. Bradshaw*, 193 W.Va. 519, 543, 457 S.E.2d 456, 480 (1995):

> "The court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. The trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to the [trial] court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion."

■■■ Under *Bradshaw*, when an objection to a jury instruction involves the trial court's expression and formulation of the jury charge, this Court will review under an abuse of discretion standard. Therefore, we review jury instructions to determine whether, tak-

---

12. Generally, we review a trial court's refusal to give or the actual giving of a certain instruction under an abuse of discretion standard. Where, however, the question is whether the jury instructions failed to state the proper legal standard, this Court's review is plenary. "Whether jury instructions were properly [legally] given is a question of law[.]" *U.S. v. Morrison*, 991 F.2d 112, 116 (4th Cir.1993).

13. In connection with a review of the legal sufficiency of the instructions, if we were to deter-

mine, as the State urges, that the defendant did not object to one or more of the trial court's instructions regarding the legal standard, we would review its legal propriety under a "plain error" standard. *See State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). In *Miller*, we suggested that where a party does not make a clear, specific objection at trial to the charge that he challenges as erroneous, he forfeits his right to appeal unless the issue is so fundamental and prejudicial as to constitute "plain error."

en as a whole and in light of the evidence, they mislead the jury or state the law incorrectly to the prejudice of the objecting party.[14] So long as they do not, we review the formulation of the instructions and the choice of language for an abuse of discretion. We will reverse only if the instructions are incorrect as a matter of law or capable of confusing and thereby misleading the jury.

### 2. Adequacy of Jury Instructions as to the Elements of First Degree Murder

■ The purpose of instructing the jury is to focus its attention on the essential issues of the case and inform it of the permissible ways in which these issues may be resolved. If instructions are properly delivered, they succinctly and clearly will inform the jury of the vital role it plays and the decisions it must make. As we said in note 20 of *State v. Miller*, 194 W.Va. at 16, 459 S.E.2d at 127 (1995) "Without [adequate] instructions as to the law, the jury becomes mired in a factual morass, unable to draw the appropriate legal conclusions based on the facts."[15] This is, in essence, what the defendant argues in this case, *i.e.*, the instructions were inadequate and failed to inform the jury of the difference between first and second degree murder.[16]

More precisely, the defendant asserts the trial court's instructions regarding the elements of first degree murder were improper because the terms wilful, deliberate, and premeditated were equated with a mere intent to kill.[17]

The jury was instructed that in order to find the defendant guilty of murder it had to find five elements beyond a reasonable doubt: "The Court further instructs the jury that murder in the first degree is when one person kills another person unlawfully, willfully, maliciously, deliberately and premeditatedly[.]"[18] In its effort to define these terms, the trial court gave three instructions.[19] State's Instruction No. 8, commonly referred to as the *Clifford* instruction, stated:

"The Court instructs the jury that to constitute a willful, deliberate and premeditated killing, it is not necessary that the intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should have come into existence for the first time at the time of such killing, or at any time previously."

*See State v. Clifford*, 59 W.Va. 1, 52 S.E. 981 (1906). State's Instruction No. 10 stated:

Actually only *Schrader* deals with the exact issue raised *sub judice*. For purposes of convenience, we will refer to instructions regarding the length of time necessary to form an intent to kill as the *Clifford* instruction, *see State v. Clifford*, 59 W.Va. 1, 52 S.E. 981 (1906), and those equating the intent to kill with premeditation as the *Schrader* instruction.

**14.** In Syllabus Point 8 of *State v. Walls*, 170 W.Va. 419, 294 S.E.2d 272 (1982), we stated:
   " 'When instructions are read as a whole and adequately advise the jury of all necessary elements for their consideration, the fact that a single instruction is incomplete or lacks a particular element will not constitute grounds for disturbing a jury verdict.' Syllabus Point 6, *State v. Milam* 159 W.Va. 691, 226 S.E.2d 433 (1976)."

**15.** Furthermore, we have stated on different occasions that "[t]he jury is the trier of the facts and 'there is no presumption that they are familiar with the law.' " *State v. Lindsey*, 160 W.Va. 284, 291, 233 S.E.2d 734, 739 (1977), *quoting State v. Loveless*, 139 W.Va. 454, 469, 80 S.E.2d 442, 450 (1954).

**16.** The defendant raises several other assignments of error regarding the jury instructions, but we find his arguments without merit.

**17.** A form of this argument was made to this Court before when similar instructions were challenged and we found the contention to be without merit. *See State v. Schrader*, 172 W.Va. 1, 302 S.E.2d 70 (1982); *State v. Riser*, 170 W.Va. 473, 294 S.E.2d 461 (1982); *State v. Belcher*, 161 W.Va. 660, 245 S.E.2d 161 (1978).

**18.** As to the other offenses, the jury instruction stated:
   "[M]urder in the second degree is when one person kills another person unlawfully and maliciously, but not deliberately or premeditatedly; that voluntary manslaughter is the intentional, unlawful and felonious but not deliberate or malicious taking of human life under sudden excitement and heat of passion; that involuntary manslaughter is where one person while engaged in an unlawful act, unintentionally causes the death of another person, or when engaged in a lawful act unlawfully causes the death of another person."

**19.** We note that defense counsel did not object to State's Instruction No. 8, and, under our standard of review, the instruction would ordinarily be reviewed only for "plain error."

"The Court instructs the jury that in order to constitute a 'premeditated' murder an intent to kill need exist only for an instant." State's Instruction No. 12 stated: "The Court instructs the jury that what is meant by the language willful, deliberate and premeditated is that the killing be intentional." State's Instruction Nos. 10 and 12 are commonly referred to as *Schrader* instructions. *See State v. Schrader*, 172 W.Va. 1, 302 S.E.2d 70 (1982).

The linchpin of the problems that flow from these instructions is the failure adequately to inform the jury of the difference between first and second degree murder. Of particular concern is the lack of guidance to the jury as to what constitutes premeditation and the manner in which the instructions infuse premeditation with the intent to kill.

At common law, murder was defined as the unlawful killing of another human being with "malice aforethought." Because the common law definition of "malice aforethought" was extremely flexible, "it became over time an 'arbitrary symbol' used by trial judges to signify any of the number of mental states deemed sufficient to support liability for murder." John S. Baker, Jr., Daniel H. Benson, Robert Force, & B.J. George, Jr., *Hall's Criminal Law* 268–69 (5th ed. 1993). Nevertheless, most American jurisdictions maintained a law of murder built around common law classifications. Pertinent to this case, the most significant departure from the common law came on April 22, 1794, when the Pennsylvania Legislature enacted a statute dividing murder into degrees.[20] It decreed that the death penalty would be inflicted only for first degree murder. West Virginia, like most other states, followed the Pennsylvania practice. Indeed, the 1794 Pennsylvania statute is nearly identical to

W.Va.Code, 61–2–1 (1991), our murder statute.[21]

The West Virginia Legislature chose not to define the term "premeditated" in W.Va. Code, 61–2–1. As a result, this Court consistently has resorted to the common law. *See State v. Clifford, supra. See also State v. Belcher*, 161 W.Va. 660, 245 S.E.2d 161 (1978); *State v. Shaffer*, 138 W.Va. 197, 75 S.E.2d 217 (1953); *State v. Painter*, 135 W.Va. 106, 63 S.E.2d 86 (1950); *State v. Burdette*, 135 W.Va. 312, 63 S.E.2d 69 (1950); *State v. Porter*, 98 W.Va. 390, 127 S.E. 386 (1925); *State v. Wilson*, 95 W.Va. 525, 121 S.E. 726 (1924).

In addition to *Clifford*, there are several cases that have made specific attempts to further define premeditation. In *State v. Dodds*, 54 W.Va. 289, 297–98, 46 S.E. 228, 231 (1903), we said:

> " 'The next ingredient of the crime is that it must be deliberate. To deliberate is to reflect, with a view to make a choice. If a person reflects, though but for a moment before he acts, it is unquestionably a sufficient *deliberation* within the meaning of the statute. The last requisite is that the killing must be *premeditated. To premeditate is to think of a matter before it is executed. The word, premeditated, would seem to imply something more than deliberate, and may mean that the party not only deliberated, but had formed in his mind the plan of destruction.'* " (Emphasis added to last sentence).

In *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982), we made an effort to distinguish the degrees of murder by indicating that the elements that separate first degree murder and second degree murder are deliberation and premeditation in addition to

**20.** The 1794 Pennsylvania statute provided that "all murder, which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree[.]" 1794 Pa.Laws, Ch. 1766, § 2, quoted in *Commonwealth v. Jones*, 457 Pa. 563, 570–71, 319 A.2d 142, 147 (1974).

**21.** W.Va.Code, 61–2–1, states, in part:

"Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody ... is murder of the first degree. All other murder is murder of the second degree."

the formation of the specific intent to kill. Deliberation and premeditation mean to reflect upon the intent to kill and make a deliberate choice to carry it out. Although no particular amount of time is required, there must be at least a sufficient period to permit the accused to actually consider in his or her mind the plan to kill. In this sense, murder in the first degree is a calculated killing as opposed to a spontaneous event. After noting the above language in *Dodds*, Justice Miller stated in *Hatfield*:

"The terms 'deliberate' and 'premeditated' have not often been defined in our cases but do carry a certain degree of definitional overlap. This point is made in LaFave & Scott, *Criminal Law* § 73, at 563 (1972 ed.):

" 'To be guilty of this form of first degree murder the defendant must not only intend to kill but in addition he must premeditate the killing and deliberate about it. It is not easy to give a meaningful definition of the words "premeditate" and "deliberate" as they are used in connection with first degree murder. Perhaps the best that can be said of "deliberation" is that it requires a cool mind that is capable of reflection, and of "premeditation" that it requires that the one with the cool mind did in fact reflect, at least for a short period of time before his act of killing.' (Footnotes omitted)

"But, as LaFave & Scott also point out: 'The intention may be finally formed only as a conclusion of prior premeditation and deliberation.' *Id.*" 169 W.Va. at 200–01, 286 S.E.2d at 409.

Although we approved the jury instruction from *Clifford* that "it is only necessary that the intention to kill should have come into existence for the first time at the time of the killing" in *Hatfield*, Justice Miller explained this instruction was merely intended to convey the notion that it is possible for deliberation and premeditation to precede

the formation of the actual intent to kill. Justice Miller further stated:

"Here, the *Clifford* instruction refers primarily to the intention to kill not existing for any particular time and arising at the moment of the killing. This means the specific intent to kill and is to be distinguished from the elements of deliberation and premeditation which are the state of mind conveying the characteristics of reflection." 169 W.Va. at 201, 286 S.E.2d at 409.

This is the meaning of the so-called *Clifford* instruction and, when it is given, its significance should be explained to the jury.

The source of the problem in the present case stems from language in *State v. Schrader*, 172 W.Va. 1, 302 S.E.2d 70 (1982). While this Court elaborated on the meaning of premeditation, we gave it a different definition than that approved in *Hatfield* and *Dodds*. In *Schrader*, we stated:

"Hence, when the West Virginia Legislature adopted the Virginia murder statute in 1868, the meaning of 'premeditated' as used in the statute was essentially 'knowing' and 'intentional.' Since then, courts have consistently recognized that the mental process necessary to constitute 'willful, deliberate and premeditated' murder can be accomplished very quickly or even in the proverbial 'twinkling of an eye.' ... *The achievement of a mental state contemplated in a statute such as ours can immediately precede the act of killing. Hence, what is really meant by the language 'willful, deliberate and premeditated' in W.Va. Code, 61–2–1 [1923] is that the killing be intentional.*" 172 W.Va. at 6, 302 S.E.2d at 75. (Emphasis added).

The language emphasized above supplied the legal authority and basis for State's Instruction Nos. 10 and 12.

While many jurisdictions do not favor the distinction between first and second degree murder,[22] given the doctrine of separation of

---

22. The Model Penal Code and many of the modern state criminal codes abolish the first and second degree murder distinction in favor of classifications based on more meaningful criteria. Interestingly, defining premeditation in

such a way that the formation of the intent to kill and the killing can result from successive impulses, *see Schrader, supra* (intent equals premeditation formula), grants the jury complete discretion to find more ruthless killers guilty of first degree

powers, we do not have the judicial prerogative to abolish the distinction between first and second degree murder and rewrite the law of homicide for West Virginia; unless, of course, we were to declare this classification a violation of due process and force the Legislature to rewrite the law—a bold stroke that we refuse to do. On the other hand, we believe within the parameters of our current homicide statutes the *Schrader* definition of premeditation and deliberation is confusing, if not meaningless. To allow the State to prove premeditation and deliberation by only showing that the intention came "into existence for the first time at the time of such killing" completely eliminates the distinction between the two degrees of murder. Hence, we feel compelled in this case to attempt to make the dichotomy meaningful by making some modifications to our homicide common law.

▮▮▮ Premeditation and deliberation should be defined in a more careful, but still general way to give juries both guidance and reasonable discretion. Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. As suggested by the dissenting opinion in *Green v. State*, 1 Tenn.Crim.App. 719, 735, 450 S.W.2d 27, 34 (1970): "True, it is not necessary to prove premeditation existed for any definite period of time. But it is necessary to prove that it did exist." This means there must be an opportunity for some reflection on the intention to kill after it is formed. The accused must kill purposely after contemplating the intent to kill. Although an elaborate plan or scheme to take

life is not required, our *Schrader*'s notion of instantaneous premeditation and momentary deliberation is not satisfactory for proof of first degree murder. In *Bullock v. United States*, 74 App.D.C. 220, 221, 122 F.2d 213, 214 (1941), *cert. denied*, 317 U.S. 627, 63 S.Ct. 39, 87 L.Ed. 507 (1942), the court discussed the need to have some appreciable time elapse between the intent to kill and the killing:

> "To speak of premeditation and deliberation which are instantaneous, or which take no appreciable time, is a contradiction in terms. It deprives the statutory requirement of all meaning and destroys the statutory distinction between first and second degree murder. At common law there were no degrees of murder. If the accused had no overwhelming provocation to kill, he was equally guilty whether he carried out his murderous intent at once or after mature reflection. Statutes like ours, which distinguish deliberate and premeditated murder from other murder, reflect a belief that one who meditates an intent to kill and then deliberately executes it is more dangerous, more culpable or less capable of reformation than one who kills on sudden impulse; or that the prospect of the death penalty is more likely to deter men from deliberate than from impulsive murder. The deliberate killer is guilty of first degree murder; the impulsive killer is not. The quoted part of the charge was therefore erroneous."

Thus, there must be some evidence that the defendant considered and weighed his decision to kill in order for the State to establish premeditation and deliberation under our first degree murder statute.[23] This is what

---

murder regardless of actual premeditation. History teaches that such unbridled discretion is not always carefully and thoughtfully employed, and this case may be an example. In 1994, the Legislature raised the penalty for second degree murder to ten-to-forty years (from five-to-eighteen years), making it less important to give juries the unguided discretion to find the aggravated form of murder in the case of more ruthless killings, irrespective of actual premeditation. The penalties are now comparable.

**23.** In the absence of statements by the accused which indicate the killing was by prior calcula-

tion and design, a jury must consider the circumstances in which the killing occurred to determine whether it fits into the first degree category. Relevant factors include the relationship of the accused and the victim and its condition at the time of the homicide; whether plan or preparation existed either in terms of the type of weapon utilized or the place where the killing occurred; and the presence of a reason or motive to deliberately take life. No one factor is controlling. Any one or all taken together may indicate actual reflection on the decision to kill. This is what our statute means by "willful, deliberate and premeditated killing."

is meant by a ruthless, cold-blooded, calculating killing. Any other intentional killing, by its spontaneous and nonreflective nature, is second degree murder.[24]

We are asked to overrule the language appearing in *Schrader*, as reflected in State's Instruction No. 8 and, particularly, the language of State's Instruction Nos. 10 and 12, so that there might be some clarity and coherence to the law of homicide. We naturally are reluctant to overrule prior decisions of this Court. No court likes to acknowledge a mistake, and adherence to precedent is based on deeper reasons than *amour propre;* rather, it is in fact a cornerstone of Anglo–American adjudication. Additionally, the more recent a precedent, the more authoritative it is because there is less likelihood of significantly changed circumstances that would provide a "special justification" for reassessing the soundness of the precedent. Nevertheless, the circumstances of this case are different, and we agree with the defendant that the language in our opinion in *Schrader* virtually eliminates the distinction in this State between first and second degree murder, equating as it does premeditation with the formation of the intent to kill. We have tried to clarify the difference between the degrees of murder in the preceding paragraphs. We find that *Schrader* wrongly equated premeditation with intent to kill and in so doing undermined the more meaningful language of *Hatfield* and *Dodds.* To the extent that the *Schrader* opinion is inconsistent with our holding today, it is overruled. In overruling *Schrader,* we do not take lightly the policy underlying *stare decisis.* However, we believe:

"Remaining true to an 'intrinsically sounder' doctrine established in prior cases better serves the values of stare decisis than would following a more recently decided case inconsistent with the decisions that came before it; the latter course would simply compound the recent error and would likely make the unjustified break from previously established doctrine complete. In such a situation 'special justification' exists to depart from the recently decided case." *Adarand Constr., Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2115, 132 L.Ed.2d 158, 185 (1995).

Overturning precedent with a long standing in the law that has become an integrated fabric in the law is different. Therefore, we leave in tact the *Clifford* rule as amplified by *Hatfield.* So by refusing to follow *Schrader* but continuing *Clifford* and *Hatfield,* "we do not depart from the fabric of the law; we restore it." *Adarand Constructors, Inc. v. Pena,* —— U.S. at ——, 115 S.Ct. at 2116, 132 L.Ed.2d at ——.

Finally, we feel obligated to discuss what instruction defining premeditation is now acceptable. What came about as a mere suggestion in *Hatfield,* we now approve as a proper instruction under today's decision. Note 7 of *Hatfield,* 169 W.Va. at 202, 286 S.E.2d at 410, states:

"A more appropriate instruction for first degree murder, paraphrased from 2 Devitt and Blackmar, *Federal Jury Practice and Instructions* § 41.03, at 214, is:

" 'The jury is instructed that murder in the first degree consists of an intentional, deliberate and premeditated killing which means that the killing is done after a period of time for prior consideration. The duration of that period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ, and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he

---

24. As examples of what type of evidence supports a finding of first degree murder, we identify three categories: (1) "planning" activity—facts regarding the defendant's behavior prior to the killing which might indicate a design to take life; (2) facts about the defendant's prior relationship or behavior with the victim which might indicate a motive to kill; and (3) evidence regarding the nature or manner of the killing which indicate a deliberate intention to kill according to a preconceived design. The California courts evidently require evidence of all three categories or at least extremely strong evidence of planning activity or evidence of category (2) in conjunction with either (1) or (3). *See People v. Anderson,* 70 Cal.2d 15, 73 Cal.Rptr. 550, 447 P.2d 942 (1968). These examples are illustrative only and are not intended to be exhaustive.

intended, is sufficient to support a conviction for first degree murder.' "

Having approved a new instruction in the area of homicide law, we do not believe today's decision should be applied retroactively. Applying the test articulated in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), a "new rule" should not be given retroactive effect. More precisely, the rules we announce are "not *dictated* by precedent existing at the time" of our opinion. *Gilmore v. Taylor,* —— U.S. ——, ——, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306, 316 (1993), *quoting Teague,* 489 U.S. at 301, 109 S.Ct. at 1070, 103 L.Ed.2d at 349. (Emphasis in original). Nevertheless, we need not apply the "new rule" to the defendant's case on this appeal because this case is being reversed on other grounds. The defendant is entitled, however, to the benefit of this decision on remand.

As a more general matter, the failure to follow precisely what we are now prescribing could, under certain circumstances, be harmless error. We note that the trial court continuously reinforced the notions that the burden of proof in a criminal case is always upon the prosecution; that the defendant is protected by a presumption of innocence; and that, unless he is proven guilty beyond a reasonable doubt, the defendant must be acquitted. In addition, the trial court instructed the jury to consider the charge as whole rather than singling out any one instruction. These actions reinforce our belief that it is unlikely the defendant was prejudiced to the point of reversible error.

## C.

### *Misconduct of the Prosecuting Attorney*

[33, 34] We turn next to the defendant's argument that the prosecutor prejudiced his right to a fair trial when he was permitted to argue the penalties of the different offenses and to cross-examine the defendant's father on the defendant's racial and gender biases and his political beliefs. Because we conclude the prosecutor's remarks and his cross-examination were improper, we also will go on to weigh the error under our harmless error standard. We look at each of the defendant's contentions separately because our review for harmless error is fact specific.[25] *See McDougal v. McCammon,* 193 W.Va. 229, 239, 455 S.E.2d 788, 798 (1995).

### 1. Disclosing the Possible Penalties

During the rebuttal portion of closing arguments, the prosecuting attorney informed the jury that the punishment for second degree murder is five to eighteen years imprisonment; a voluntary manslaughter conviction carries a punishment of one to five years in the penitentiary; and involuntary manslaughter could lead to imprisonment for up to a year. He also told the jury that should the defendant be convicted of first degree murder, he would be eligible for parole in ten years, but he would not necessarily receive parole at that time. Defense counsel's timely objection to these comments was overruled.

The defendant asserts that such practice rises to the level of constitutional error because the jury may have determined the degree of homicide by what it believed the appropriate punishment to be. The State contends the prosecuting attorney may inform the jury of the applicable penalties for the possible convictions as long as a correct statement of the law is made.

Both parties to this appeal seem to acknowledge that our cases are not entirely

---

25. The inquiry focuses on the fairness of the trial and not the culpability of the prosecutor because allegations of prosecutorial misconduct are based on notions of due process. In determining whether a statement made or evidence introduced by the prosecution represents an instance of misconduct, we first look at the statement or evidence in isolation and decide if it is improper. If it is, we then evaluate whether the improper statement or evidence rendered the trial unfair. Several factors are relevant to this evaluation, among them are: (1) The nature and seriousness of the misconduct; (2) the extent to which the statement or evidence was invited by the defense; (3) whether the statement or evidence was isolated or extensive; (4) the extent to which any prejudice was ameliorated by jury instructions; (5) the defense's opportunity to counter the prejudice; (6) whether the statement or evidence was deliberately placed before the jury to divert attention to irrelevant and improper matters; and (7) the sufficiency of the evidence supporting the conviction. *See generally Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *State v. Sugg,* 193 W.Va. 388, 456 S.E.2d 469 (1995).

consistent in reference to the relevance of penalty evidence and penalty comment during closing arguments. We believe our prior rulings can be placed into two broad categories. The first category concerns cases involving a recommendation of mercy. We have said, for example, in first degree murder cases, it is the mandatory duty of the trial court to instruct the jury that it may add a recommendation of mercy to such verdict and to explain to the jury the legal implications of such a recommendation. To this extent, a prosecuting attorney is permitted to comment on the significance of this recommendation and to make appropriate argument against such a recommendation. However, even here, we limit the scope of the permissible argument: The prosecuting attorney cannot argue that a recommendation of mercy would enable the defendant to *receive parole* in ten years. *State v. Lindsey,* 160 W.Va. 284, 233 S.E.2d 734 (1977). Nor have we authorized the prosecutor to argue beyond the first degree murder penalties. Of course, in the case *sub judice,* the prosecuting attorney did not violate this rule in that he stated the defendant may be *eligible for parole* in ten years should he be convicted of first degree murder with a recommendation of mercy. In fact, the jury was properly instructed by State's Instruction No. 11 that stated, in part:

> "[F]irst degree [murder] is punishable by confinement in the penitentiary of this state for life and the accused shall not be eligible for parole except and unless the jury shall add its recommendation of mercy in their verdict and if such recommendation is added to their verdict, such person shall then be eligible for consideration for parole after serving a minimum of ten years of such sentence, such eligibility in no way guaranteeing immediate release."

■ The second category concerns the mentioning of penalties in cases other than those involving recommendations of mercy. The issue we must address is whether the prosecuting attorney may inform the jury of the appropriate penalties for convictions when, as in this case, the jury must choose between varying degrees of an offense. Our cases generally hold that such penalty information is irrelevant. Directly addressing the issue in *State v. Parks,* 161 W.Va. 511, 516, 243 S.E.2d 848, 852 (1978), we stated that placing sentencing matters before the jury is "an issue prejudicial to the fact-finding function of the jury." The right to fix punishment rests exclusively within the discretion of the trial court, and neither party has the right outside of "capital" cases to have the jury informed of the possible penalties. *See generally State v. Massey,* 178 W.Va. 427, 432 n. 2, 359 S.E.2d 865, 870 n. 2 (1987). This is so because a jury is not permitted to concern itself with sentencing matters outside of a recommendation of mercy. *See State v. Lindsey, supra* (jury should not concern itself with irrelevant matters such as parole); *State v. Loveless,* 139 W.Va. 454, 80 S.E.2d 442 (1954). Therefore, we hold that outside the context of cases involving a recommendation of mercy, it is improper for either party to refer to the sentencing possibilities of the trial court should certain verdicts be found or to refer to the ability of the trial court to place a defendant on probation.[26] *See U.S. v. Meredith,* 824 F.2d 1418, 1429 (4th Cir.), *cert. denied,* 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987) *and* 485 U.S. 991, 108 S.Ct. 1297, 99 L.Ed.2d 507 (1988).

■ The universal rule is that punishment is the trial court's role and is not a proper matter for the jury. The jury's sole function in a criminal case is to pass on whether a defendant is guilty as charged based on the evidence presented at trial and the law as given by the jury instructions. *See Chambers v. State,* 337 Md. 44, 650 A.2d 727 (1994). The applicable punishments for the lesser-included offenses are not elements of the crime; therefore, the question of what punishment the defendant could receive if convicted is not a proper matter for closing argument. *See Rowe v. Indiana,* 250 Ind. 547, 237 N.E.2d 576 (1968).[27]

---

**26.** We note the defendant is likewise prohibited from informing the jury of the possible sentences he may face if convicted. *See generally U.S. v. Chandler,* 996 F.2d 1073 (11th Cir.1993); *Commonwealth v. Bowser,* 425 Pa.Super. 24, 624 A.2d 125 (1993).

**27.** A proper closing argument in a criminal case involves the summation of evidence, any reason-

Both parties cite *State v. Myers,* 159 W.Va. 353, 222 S.E.2d 300 (1976), where we stated it was not error for the prosecuting attorney to say the defendant could be eligible for parole after five years if convicted of second degree murder. The State relies heavily·upon *Myers,* at least to the extent that it creates a vacillation in our decisions. We do not find that *Myers* is persuasive authority to support the arguments of the State.[28]

We believe that any substantial reliance on *Myers* is misplaced. First, it appears that the language used in *Myers* was nothing but a means of distinguishing between what the Court considered the least offensive as opposed to the more egregious remark:

"In view of the fact that this Court finds no error in an instruction which embodies in statutory language the penalties which will be imposed by law for the various offenses of which a defendant may be found guilty, such ruling by the trial court was *probably technically correct.* The same cannot be said with reference to the court's treatment of the Prosecutor's remark:

"'When they talk about keeping somebody in Weston Hospital or even at the V.A., we know they get out right and left.'"

159 W.Va. at 362, 222 S.E.2d at 306.

The bottom line is that the conviction in *Myers* was reversed because the prosecuting attorney argued matters to the jury that were irrelevant for its consideration.[29] In short, we believe that the Court's discussion on this point in *Myers* was purely an anomaly. It is doubtful the Court would have reached this same conclusion had that issue alone been its focus, and we refuse to do so here.

Likewise, Standard 3–5.8(d) of the American Bar Association Standards for Criminal Justice (2nd ed. 1980) explains: "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." Standard 3–5.9 further advises: "It is unprofessional conduct for the prosecutor to intentionally to refer to or argue on the basis of facts outside the record."

It is quite obvious that the prosecution improperly injected "issues broader than the guilt or innocence" of the defendant and argued "facts outside the record." To do either is improper and, to the extent the decision in *Myers* is inconsistent with our holding, it is expressly overruled. To rule otherwise would permit a jury to base its finding as to the degree of guilt on irrelevant factors.

**2. Questions Relating to the Defendant's Prejudices**

During the cross-examination of the defendant's father, the prosecuting attorney inquired about prejudicial statements allegedly made by the defendant. Bobby Lee Guthrie was asked if the defendant told him that men were better than women and women should stay at home, that whites were better than blacks, and whether the two of them discussed the Ku Klux Klan. Defense counsel objected to this line of questioning because of its highly prejudicial effect, particularly with

able inferences from the evidence, responses to the opposing party's argument, and pleas for law enforcement generally. *See Coleman v. State,* 881 S.W.2d 344 (Tex.Cr.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995).

**28.** Precedent does not cease to be authoritative merely because counsel in a later case advances a new argument. *See generally Matter of Penn Central Transp. Co.,* 553 F.2d 12 (3rd Cir.1977). But, as a practical matter, a precedent-creating opinion that contains no extensive analysis of an important issue is more vulnerable to being overruled than an opinion which demonstrates that the court was aware of conflicting decisions and gave at least some persuasive discussion as to why the old law must be changed.

**29.** It appears the Court in *Myers* was under the assumption that a trial court had authority to instruct generally on the penalties in criminal cases. No authority is cited for that proposition, and we know of none to support such a sweeping statement.

the women on the jury and the one African–American juror.

■ The State asserted it was proper cross-examination because the defense opened the door when it portrayed the defendant as a good, quiet, Bible-reading man when, in fact, he had made some bigoted comments to the State's psychiatrist, Dr. Ralph Smith.[30] The State also argues the defendant was not prejudiced by these few questions concerning his views because Dr. Smith was not called as a witness and this issue was not raised further.[31] Nevertheless, a curative instruction was not requested by either party and none was given.

■ Although most rulings of a trial court regarding the admission of evidence are reviewed under an abuse of discretion standard, *see McDougal v. McCammon, supra,* an appellate court reviews *de novo* the legal analysis underlying a trial court's decision. *See Hottle v. Beech Aircraft Corp.,* 47 F.3d 106 (4th Cir.1995). A trial court's discretion is not unbounded, and the scope of the trial court's discretion varies according to the issue before it. In considering the ad-

---

30. The transcript reveals the following exchange between the prosecuting attorney and the defendant's father:

"Q. When you all would have these discussions, political, all kinds of discussions, did he ever tell you that women should be in the home and that men were better than women?

"A. No.

"Q. You never heard him say that, never heard him comment on that?

"A. No.

"Q. Did you ever hear him comment that whites are better than blacks?

"MR. CLINE: Objection, Your Honor. Move to approach the bench.

"A. No, he did not.

"THE COURT: Just a moment. Let's not get into those areas. I don't think they're needed. I don't recall any blacks being involved in this case.

\* \* \* \* \* \*

"(Conference at the bench)

"MR. BROWN: This is the psychological report.

"THE COURT: Is this Smith's report?

"MR. BROWN: Yes. Here's the quote right here (indicating). This is where they talked about all kinds of things and where he alluded to the blacks and the KKK and—

"THE COURT: Well, I agree; but don't get into it. I agree that they talked about Hitler and blacks and things of that nature. I don't want that crap in here.

\* \* \* \* \* \*

"MR. BROWN: Let me explain. They're portraying this guy as a nice, calm, Bible reading man, takes long walks in the woods, a nice young man. And that's not what we really have here. What we have is a bigoted, prejudiced individual. And I've got witnesses who will testify to that. We've got a witness up here now who's trying to say he's a nice guy, quiet, and they're very serious people.

"THE COURT: I'll let you get it in through Smith.

\* \* \* \* \* \*

"... You can ask him if he ever talked about blacks, talked about—Knock it off there.

\* \* \* \* \* \*

"... Yes, you can bring back Smith and Gibson.

"MR. CLINE: Note our objection and exception for the record.

"MR. WARNER: Judge, before he brings it up we want to be heard at the bench or out of the hearing of the jury specifically on that issue, just what they've got, which are statements someone told to him, nothing to do with this crime. It has nothing to do with this crime, and it's highly prejudicial because it's—

\* \* \* \* \* \*

"(In open court)

"Q. Did you and your son ever have discussions about the Klu [*sic*] Klux Klan?

"A. Not discussions, no.

"Q. Did you ever hear him express views on the Klu [*sic*] Klux Klan?

"A. From the news that he has heard on TV.

"Q. Did you ever hear him express any opinion about Hitler?

"A. No."

31. We consider the purpose of the prosecution's cross-examination was to impeach the witness by confronting him with information about his son that was inconsistent with the witness's testimony on direct examination. We note the prosecution made no effort to introduce the testimony of Dr. Smith. In this connection, however, it is well settled that a party may not present extrinsic evidence of specific instances of conduct to impeach a witness on a collateral matter. *See* W.Va.R.Evid. 608(b). A matter is considered noncollateral if "the matter is itself relevant in the litigation to establish a fact of consequence[.]" 1 *McCormick On Evidence* § 49 at 167 (4th ed. 1992). *See also Michael on Behalf of Estate of Michael v. Sabado,* 192 W.Va. 585, 453 S.E.2d 419 (1994).

missibility of impeachment evidence, we apply the same standards of relevance that we apply to other questions of admissibility.

■ Appellate courts give strict scrutiny to cases involving the alleged wrongful injection of race, gender, or religion in criminal cases. Where these issues are wrongfully injected, reversal is usually the result. *See Miller v. N.C.*, 583 F.2d 701 (4th Cir.1978); *Weddington v. State*, 545 A.2d 607 (Del.Sup. 1988). In *State v. Bennett*, 181 W.Va. 269, 274, 382 S.E.2d 322, 327 (1989), this Court condemned the practice of attorneys making unnecessary racial remarks in the presence of the jury:

> "Although Mr. Perrill referred to Dr. Arrieta as 'the colored lady' only once, it should not have been said for the obvious reason that it may be construed as an appeal to prejudice. 'To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended.' *McFarland v. Smith*, 611 F.2d 414, 417 (2d Cir.1979)."

The same rationale applies to the prosecuting attorney drawing the jury's attention to racial, gender, and political comments made by the defendant which in no way relate to the crime.[32]

■ Under the first step of our inquiry, we must determine whether the evidence is relevant to an issue of consequence.

Where race, gender, or religion is a relevant factor in the case, its admission is not prohibited unless the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *See Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988); *State v. Crockett*, 164 W.Va. 435, 265 S.E.2d 268 (1979). Normally, in order to be probative, evidence must be "relevant" under Rule 401, that is, it must tend to make an issue in the case more or less likely than would be so without the evidence. Other factors that bear on the probative value are the importance of the issue and the force of the evidence. 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5214 (1978). In this case, the State's most difficult problem throughout this appeal is explaining how this evidence is relevant to an issue of consequence in the case.

■ The prosecution argues that such evidence is relevant as impeachment evidence in light of the father's comments on direct examination when he portrayed the defendant as a good, quiet, Bible-reading man. In analyzing the contentions of the parties, we first observe that only the evidence of the defendant's quiet and peaceful character was admissible under Rule 404(a)(1) of the West Virginia Rules of Evidence.[33] Quite clearly, evidence that the defendant was a "Bible-reading man" and his religious beliefs are not admissible under the same rule because they simply do not concern a pertinent character trait. *See State v. Marrs*, 180 W.Va. 693, 379 S.E.2d 497 (1989) (defendant's reputation for not selling drugs is inadmissible). *See also* W.Va.R.Evid. 610.[34] This issue is in this case only because

---

**32.** There is a plethora of authority supporting the notion that matters such as race, religion, and nationality should be kept from a jury's consideration. See *Peck v. Bez*, 129 W.Va. 247, 40 S.E.2d 1 (1946), where counsel for the plaintiff made reference to the defendant's religion and foreign nationality. This Court reversed stating "[t]hese matters, of course, were not pertinent to the matters in issue and had no place in the argument." 129 W.Va. at 263, 40 S.E.2d at 10. With uniform regularity, we have held that counsel should not be permitted to appeal to the jury's passions or prejudices. *See generally Crum v. Ward*, 146 W.Va. 421, 122 S.E.2d 18 (1961); *State v. Summerville*, 112 W.Va. 398, 164 S.E.

508 (1932); *Hendricks v. Monongahela West Penn Public Serv. Co.*, 111 W.Va. 576, 163 S.E. 411 (1932); *State v. Hively*, 108 W.Va. 230, 150 S.E. 729 (1929).

**33.** The prosecution chose not to rebut evidence of the defendant being quiet or peaceful, which was permitted under Rule 404(a)(1), Rule 404(a)(2), and/or Rule 405.

**34.** Rule 610 states: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced."

the prosecution chose not to object to the inadmissible evidence.[35] Thus, we must decide whether the prosecution should have been permitted to rebut this evidence under our curative admissibility rule. We hold the prosecution evidence was barred under the doctrine of curative admissibility and Rule 403.

■ The doctrine of curative admissibility is to be evaluated under our relevancy rules. To some extent, this rule is a restatement of the general rule that when a party opens up a subject, there can be no objection if the opposing party introduces evidence on the same subject. The most significant feature of the curative admissibility rule, however, is that it allows a party to present otherwise inadmissible evidence on an evidentiary point where an opponent has "opened the door" by introducing similarly inadmissible evidence on the same point. Perhaps, the clearest statement of curative admissibility came in *Danielson v. Hanford*, 352 N.W.2d 758, 761 (Minn.App.1984), where the Minnesota court, quoting from *Busch v. Busch Construction, Inc.*, 262 N.W.2d 377, 387 (Minn.1977), stated:

> "In order to be entitled as a matter of right to present rebutting evidence on an evidentiary fact: (a) the original evidence must be inadmissible and prejudicial, (b) the rebuttal evidence must be similarly inadmissible, and (c) the rebuttal evidence must be limited to the same evidentiary fact as the original inadmissible evidence."[36] (Footnote omitted).

We believe the prosecution faces two hurdles in this case. First, was the evidence offered by the defendant prejudicial? This case was not one in which Bible reading had any rele-

vancy. The defendant confessed to the killing and there were eyewitnesses. The only issue that the jury seriously had to consider was the degree of guilt. Certainly, whether the defendant read the Bible could have little impact on the degree of homicide. Second, the prosecution sought to go far beyond the evidence originally offered by the defendant. The fact that the defendant read the Bible and walked through the woods is hardly related to his affinity for Adolph Hitler, his dislike of African–Americans, and his chauvinistic feelings toward women.

The second inquiry under Rule 403 is whether the probity of the objected to evidence was substantially outweighed by its prejudice. In this regard, the defendant argues that even if the evidence had some probative value, it is clearly inadmissible under Rule 403. In *State v. Derr*, 192 W.Va. 165, 178, 451 S.E.2d 731, 744 (1994), we stated "that although Rules 401 and 402 strongly encourage the admission of as much evidence as possible, Rule 403 restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence." Rule 403 calls upon the trial court to weigh the probative evidence against the harm that it may cause—unfair prejudice, confusion, misleading the jury, delay, or repetition—and to exclude the evidence if the probative value is "substantially outweighed" by the harm.

■ Thus, to perform the Rule 403 balance, we must assess the *degree* of probity of the evidence, which, in turn, depends on its relation to the evidence and strategy presented at trial in general. The mission of Rule 403 is to eliminate the obvious instance

**35.** Although we recognize that the scope and extent of cross-examination lie within the discretion of the trial court, we believe it is important to underscore the principle of evidentiary law that no party has a right on cross-examination to offer irrelevant and incompetent evidence. *See Doe v. U.S.*, 666 F.2d 43 (4th Cir.1981). The United States Supreme Court has noted that even the right to cross-examine witnesses may, in an appropriate case, "bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297, 309 (1973). We believe Rule 403 is one of those "other legitimate interests."

**36.** Professor McCormick addressed the question as to how the curative admissibility rule is triggered: "If the [irrelevant] evidence ... is so prejudice-arousing that an objection or motion to strike cannot have erased the harm, then it seems that the adversary should be entitled to answer it as of right." *McCormick on Evidence* § 57 at 84 (4th ed. 1992). Certainly, any prejudice flowing from the father's testimony could have been cured by a motion to strike and by an instruction to disregard.

in which a jury will convict because its passions are aroused rather than motivated by the persuasive force of the probative evidence. Stated another way, the concern is with any pronounced tendency of evidence to lead the jury, often for emotional reasons, to desire to convict a defendant for reasons other than the defendant's guilt. In *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir.1993), the court stated:

> "We have defined undue prejudice as ' "a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." ' . . .
>
> " . . . When evidence of a defendant's involvement in several of these activities is presented to the jury, the risk of unfair prejudice is compounded. In such a case, we fear that jurors will convict a defendant based on the jurors' disdain or their belief that the defendant's prior bad acts make guilt more likely. Furthermore, we are especially sensitive to prejudice in a trial where defendants are members of an unpopular religion." (Citations omitted).

The prejudice that the trial court must assess is the prejudice that "lies in the danger of jury *misuse* of the evidence." *U.S. v. Brown*, 490 F.2d 758, 764 (D.C.Cir.1973). (Emphasis in original).[37]

Prejudice is not the only threat. There is also a potential for confusing and misleading the jury. Quite apart from prejudice, there is a risk that undue emphasis on the defendant's racial, gender, and/or political views could direct the jury's attention from whether the defendant inflicted the fatal wound because of the "horseplay" or whether the defendant believed the victim was a threat to the defendant's philosophy or way' of life. This deflection might seem like a minor matter easy to guard against in the instructions so far as confusion is concerned, but, when coupled with its potential for unfair prejudice, this evidence becomes overwhelmingly

dangerous. Even if we concede that this evidence had some relevance on the impeachment issue, the risk of undue prejudice and the risk of confusion are alone enough to justify setting aside this verdict.

■ Our discussion thus far has not touched on the prosecution's need for this evidence and the closely related question of alternatives available. In note 15 of *Derr*, 192 W.Va. at 178, 451 S.E.2d at 744, we stated that "[o]ne important factor under Rule 403 is the prosecutor's need for the proffered evidence." Here, as discussed above, the evidence of the defendant's prejudices was not only unnecessary, but was not very helpful from a probative value standpoint. In applying Rule 403, it is pertinent whether a litigant has some alternative way to deal with the evidence that it claims the need to rebut that would involve a lesser risk of prejudice and confusion. 22 Wright & Graham, *supra*, § 5214 (citing cases). Obviously, we do not know what other means the prosecution had to prove the defendant was not a Bible reader or a person of peaceful character. What is important to us, however, is that the trial court failed to ascertain alternatives to this evidence before permitting the prosecution to use it. What we do know is that this issue arose because the prosecution did not object to some clearly irrelevant evidence. Nor did the trial court consider an instruction to the jury advising it to disregard all evidence of the defendant that the prosecution claimed needed rebutting. These failures strengthen our determination to declare error in this case.

■ To achieve substantial justice in our courts, a trial judge must not permit a jury's finding to be affected or decided on account of racial or gender bias and whether one holds an unpopular political belief or opinion. If Rule 403 is ever to have a significant and effective role in our trial courts, it must be used to bar the admission of this highly prejudicial evidence. *See, e.g., U.S. v.*

---

**37.** Evidence is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, Fed.R.Evid. 403. Succinctly stated, evidence is unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[03] at 403–15 to 403–17 (1978).

*Kallin,* 50 F.3d 689 (9th Cir.1995) (reversible error under Rule 403 to allow witness to testify to defendant's dislike for Mexicans). While due process does not confer upon a criminal defendant a right to an error-free trial, *see U.S. v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983),[38] it unquestionably guarantees a fundamental right to a fair trial. *See Lutwak v. U.S.,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953). We emphasize that it is a fundamental guarantee under the Due Process Clause of Section 10 of Article III of the West Virginia Constitution that these factors—race, religion, gender, political ideology—when prohibited by our laws shall not play any role in our system of criminal justice.

### 3. Harmless Error Standard

■ Prosecutorial misconduct does not always warrant the granting of a mistrial or a new trial. The rule in West Virginia since time immemorial has been that a conviction will not be set aside because of improper remarks and conduct of the prosecution in the presence of a jury which do not clearly prejudice a defendant or result in manifest injustice. *State v. Beckett,* 172 W.Va. 817, 310 S.E.2d 883 (1983); *State v. Buck,* 170 W.Va. 428, 294 S.E.2d 281 (1982). Similarly, the United States Supreme Court has acknowledged that given "the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." *U.S. v. Hasting,* 461 U.S. at 508–09, 103 S.Ct. at 1980, 76 L.Ed.2d at 106. Thus, the Supreme Court has held that an appellate court should not exercise its "[s]upervisory power to reverse a conviction ... when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error." *Hasting,* 461 U.S. at 506, 103 S.Ct. at 1979, 76 L.Ed.2d at 104.

The harmless error doctrine requires this Court to consider the error in light of the record as a whole, but the standard of review in determining whether an error is harmless depends on whether the error was constitutional or nonconstitutional. It is also necessary for us to distinguish between an error resulting from the admission of evidence and other trial error. As to error not involving the erroneous admission of evidence, we have held that nonconstitutional error is harmless when it is highly probable the error did not contribute to the judgment. *State v. Hobbs,* 178 W.Va. 128, 358 S.E.2d 212 (1987) (prosecutor's remarks although improper must be sufficiently prejudicial to warrant reversal); *State v. Brewster,* 164 W.Va. 173, 261 S.E.2d 77 (1979). On the other hand, when dealing with the wrongful admission of evidence, we have stated that the appropriate test for harmlessness articulated by this Court[39] is whether we can say with fair assurance, after stripping the erroneous evidence from the whole, that the remaining evidence was independently sufficient to support the verdict and the jury was not substantially swayed by the error.

■ In determining prejudice, we consider the scope of the objectionable comments and their relationship to the entire proceedings, the ameliorative effect of any curative instruction given or that could have been given but was not asked for, and the strength of the evidence supporting the defendant's conviction. *See McDougal v. McCammon, supra.* As the United States Supreme Court explained "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments [or conduct] standing alone, for the statements or conduct must be viewed in context[.]" *U.S. v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1, 9–10, *on remand,* 758 F.2d 514, *on reconsideration,* 767 F.2d 737 (1985) (finding harmless error where the prosecutor made an

---

38. *Cert. denied sub nom. Hasting v. U.S.,* 469 U.S. 1218, 105 S.Ct. 1199, 84 L.Ed.2d 343 (1985); *Williams v. U.S.,* 469 U.S. 1218, 105 S.Ct. 1199, 84 L.Ed.2d 343 (1985); *Anderson v. U.S.,* 469 U.S. 1218, 105 S.Ct. 1199, 84 L.Ed.2d 343 (1985); *Stewart v. U.S.,* 469 U.S. 1218, 105 S.Ct. 1200, 84 L.Ed.2d 343 (1985).

39. *See State v. Atkins,* 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980).

improper statement that the defendant was guilty and urged the jury to "do its job").

■ Notwithstanding the above discussion, this Court is obligated to see that the guarantee of a fair trial under our Constitution is honored. Thus, only where there is a high probability that an error did not contribute to the criminal conviction will we affirm. "High probability" requires that this Court possess a "sure conviction that the error did not prejudice the defendant." *U.S. v. Jannotti,* 729 F.2d 213, 220 n. 2 (3rd Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984). Indeed, the United States Supreme Court recently stated that where there is " 'grave doubt' regarding the harmlessness of errors affecting substantial rights," reversal is required. *O'Neal v. McAninch,* — U.S. —, —, 115 S.Ct. 992, 997, 130 L.Ed.2d 947, 956 (1995) ("grave doubt" about harmlessness of the error to be resolved in favor of the defendant).[40] Therefore, we will reverse if we conclude that the prosecutor's conduct and remarks, taken in the context of the trial as a whole, prejudiced the defendant.

■ In this case, we have "grave doubt" as to whether the errors can be considered harmless. The primary issue in this case was not one of guilt or innocence, but was the degree of homicide for which the defendant would ultimately be convicted. To influence the jury's evaluation and decision, the prosecution was permitted to suggest that any conviction less than first degree murder would permit the defendant to be released in five years and the defendant was a racist, a sexist, a Nazi, and a KKK sympathizer.[41] These errors in combination compel setting aside the verdict, and we do not hesitate to do so on these grounds alone. In fact, it is difficult to imagine any evidence that would have a more powerful impact upon a jury or which would be more likely to deter it from fairly finding the defendant guilty of a lesser offense.

■ However, there is more. On cross-examination, the prosecuting attorney asked the defendant if he, upon learning of the victim's death, replied to the police officer: "That's too bad, buddy. Do you think it'll snow?" Defense counsel objected because the alleged statement was not disclosed during discovery. Furthermore, the prosecuting attorney offered no factual basis for the question at trial.[42] The defendant

---

**40.** In *O'Neal,* the Supreme Court quoted with approval the following test of harmless error from the earlier case of *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–67 (1946):

> "If, when all is said and done, the [court] . . . is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand[.] . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

**41.** The only purpose this evidence could serve would be to prejudice the jury against the defendant. The defendant advises that at least one of the jurors was an African–American.

> "It does not take much imagination to understand how such grossly biased comments would be viewed by the jury. We need not know the racial composition of the jury, for

nearly all citizens find themselves repelled by such blatantly racist remarks and resentful of the person claimed to have uttered them." *U.S. v. Ebens,* 800 F.2d 1422, 1434 (6th Cir. 1986).

**42.** A recess was held at the close of the defendant's cross-examination. Out of the presence of the jury, defense counsel moved for a mistrial:

> "MR. WARNER: Your Honor, first of all, right before we closed, the Prosecutor cross examined my client on an alleged prior statement that he had made while sitting in the back of the police cruiser, immediately following the time that he apparently knew the person had died. The Prosecutor cross examined him, 'Didn't you say something to the effect, "Isn't that too bad", ' or that type of statement.
>
> "THE COURT: I think he said, 'Isn't that too bad. Do you think it will snow', or something like that.
>
> \* \* \* \* \* \*
>
> "MR. WARNER: Now that my thoughts are more clear, that statement was never, ever disclosed to us. I don't know if there is any foundation in fact for that statement at all. And I think it was terribly prejudicial at the same time. If I'm wrong on any of those

argues the State's nondisclosure of this statement, pursuant to Rule 16 of the West Virginia Rules of Criminal Procedure, was prejudicial because it hampered the preparation and presentation of his case. Syllabus Point 3 of *State v. Weaver*, 181 W.Va. 274, 382 S.E.2d 327 (1989), states:

> " 'When a trial court grants a pretrial discovery motion requiring the prosecution to disclose evidence in its possession, nondisclosure by the prosecution is fatal to its case where such nondisclosure is prejudicial. The nondisclosure is prejudicial where the defense is surprised on a material issue and where the failure to make the disclosure hampers the preparation and presentation of the defendant's case.' Syllabus Point 2, *State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980)."

*See State v. Myers, supra.* The defendant contends the issue of malice was critical at trial and the alleged statement was very damaging in proving a "heart regardless of social duty," as the jury was instructed on malice. We agree with the defendant.[43] We conclude that this line of questioning was extremely inappropriate. There seems to have been little, if any, justification for this line of questioning other than to inflame the jury through insinuation. Although we would be hesitant to reverse on this error alone, when coupled with the other errors discussed above, our decision to reverse is fortified. Syllabus Point 5 of *State v. Walker*, 188 W.Va. 661, 425 S.E.2d 616 (1992), states:

> " 'Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.' Syl. pt. 5, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972)."

## III.

## CONCLUSION

In this case, our voyage is complete. "Having navigated the waters" of burden of proof, standards of review, new guidance for instruction in homicide cases, prosecutorial misconduct, and harmless error, "we now steer this case into the port of judgment and unload the cargo we have hauled."[44] For the foregoing reasons, we are compelled to hold the admission of the evidence discussed above and the prosecution's failure to disclose the alleged oral statement of the defendant before cross-examination violated the defendant's constitutional right to a fair trial. In so doing, we merely apply settled principles of law to the facts of this case.[45]

Based on the foregoing, the judgment of the Circuit Court of Kanawha County is reversed, and this case is remanded for a new trial.

Reversed and remanded.

From reading the record, it appears the first time this statement was disclosed was during cross-examination. At the very least, the prosecution should have approached the bench and revealed the existence of the statement before using it in the cross-examination of the defendant.

**44.** *E.E.O.C. v. Steamship Clerks Union Local 1066*, 48 F.3d 594, 610 (1st Cir.1995).

**45.** "This is as it should be. Such ... will serve to justify trust in the prosecutor as 'the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " *Kyles v. Whitley*, —— U.S. ——, ——, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490, 509 (1995), *quoting Berger v. U.S.*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).

points, the Prosecutor can correct me. And I would move for a mistrial based on that.

"MR. MORRIS: Judge, as I understood, that question was more or less a rebuttal question. He denied it. We are not able to prove by extraneous evidence anything he denies. That's pretty much—

"THE COURT: I think it was proper cross examination. The record will reflect what is in the transcript. Motion for a directed verdict [mistrial] is denied. I'll note your objection and exception."

Trial courts should preclude questions for which the questioner cannot show a factual and good faith basis. *See generally State v. Banjoman*, 178 W.Va. 311, 359 S.E.2d 331 (1987). Manifestly, mere inquiries by the prosecutor as to rumors may be highly prejudicial even though answered in the negative.

**43.** Actually, this is not a real case of late disclosure; it is a case of no meaningful disclosure.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired Justice, and FOX, Judge, sitting by temporary assignment.

WORKMAN, J., concurs and reserves the right to file a concurring opinion.

WORKMAN, Justice, concurring:

I concur with the holding of the majority, but write this separate opinion to reiterate that the duration of the time period required for premeditation cannot be arbitrarily fixed. Neither the jury instruction approved by the majority, created from our past decisions in *State v. Clifford*, 59 W.Va. 1, 52 S.E. 981 (1906) and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982) (as amplified by the majority opinion), nor the new instruction approved in the majority opinion [1] affix any specific amount of time which must pass between the formation of the intent to kill and the actual killing for first degree murder cases. Given the majority's recognition that these concepts are necessarily incapable of being reduced formulaically, I am concerned that some of the language in the opinion may indirectly suggest that some appreciable length of time must pass before premeditation can occur.

I agree with the majority in its conclusion that our decision in *State v. Schrader*, 172 W.Va. 1, 302 S.E.2d 70 (1982), incorrectly equated premeditation with intent to kill. However, I must point out that the majority's suggested basis for defining premeditation and deliberation in terms of requiring some "appreciable time elapse between the intent to kill and the killing" and "some period between the formation of the intent to kill and the actual killing which indicates that the killing is by prior calculation and design" may create confusion in suggesting that premeditation must be the deeply thoughtful enterprise typically associated with the words reflection [2] and contemplation.[3] The

majority's interpretation may create ambiguity, if not clarified, by adding arguably contradictory factors to the law enunciated by the majority in the approved instruction, as well as the language in the *Hatfield* and *Dodds* cases that the majority upholds. *See Hatfield*, 169 W.Va. at 202, 286 S.E.2d at 410 n. 7; *see also State v. Dodds*, 54 W.Va. 289, 297–98, 46 S.E. 228, 231 (1903).

For instance, nowhere in *Hatfield*, which upholds the *Clifford* instruction, is the notion that an "appreciable" amount of time must lapse in order for premeditation to occur. Neither is such a suggestion evident from the majority's new instruction, derived from *Hatfield*:

"'"The jury is instructed that murder in the first degree consists of an intentional, deliberate and premeditated killing which means that the killing is done after a period of time for prior consideration. *The duration of that period cannot be arbitrarily fixed.* The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ, and according to the circumstances in which they may be placed. *Any interval of time between the forming of the intent to kill and the execution of that intent,* which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder."'"

169 W.Va. at 202, 286 S.E.2d at 410 (quoting 2 Devitt and Blackmar, *Federal Jury Practice and Instructions* § 41.03, at 214). Finally, even syllabus point five of the majority provides only that "[a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing . . . ."

Accordingly, it is necessary to make abundantly clear that premeditation is sufficiently demonstrated as long as "[a]ny interval of time[, no matter how short that interval is,

---

1. The new instruction is essentially an adoption of the instruction previously offered by the Court in note 7 of *Hatfield*. *See* 169 W.Va. at 202, 286 S.E.2d at 410 n. 7.

2. The word "reflect" is defined by Webster's as "to think quietly and calmly."

3. The word "contemplate" is defined by Webster's as "to view or consider with continued attention."

lapses] between the forming of the intent to kill and the execution of that intent[.]" *See Hatfield,* 169 W.Va. at 202, 286 S.E.2d at 410 (quoting 2 Devitt and Blackmar, *Federal Jury Practice and Instructions* § 41.03, at 214).