476 S.E.2d 189

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**James HUGHES, Defendant Below, Appellant.**

**No. 22978.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 10, 1996.

Decided July 8, 1996.

---

Dawn E. Warfield, Deputy Attorney General, Charleston, for Appellee.

J.B. Rees, Chief Public Defender, Fayetteville, for Appellant.

WORKMAN, Justice:

This case is before the Court upon the appeal of James Hughes from the September 14, 1994, final order of the Circuit Court of Fayette County sentencing the Appellant to one year in the Southern Regional Jail for his jury conviction of involuntary manslaughter. The Appellant argues that the trial court erred: 1) in denying his motion for judgment of acquittal on the grounds that the jury's verdict is manifestly against the weight of the evidence presented at trial; and 2) in denying his motion for credit for time served upon home confinement which was a condition of bail. Based upon a review of the record, the parties' briefs and all other matters submitted before this Court, we find that the lower court committed no error and, accordingly, affirm.

I.

Around 3:00 p.m. on August 20, 1993, the victim, Brad Wilkerson, along with his grand-mother, Gladys Wilkerson and his sister, Kim Wilkerson, picked up a case of beer and went to the home of one of Gladys Wilkerson's friends, Andy Maynard. Upon arriving at Mr. Maynard's house, both Mr. Maynard and Brad began drinking the beer. Gladys Wilkerson testified that she left the house for a while and when she returned, her grandson was inebriated. Ms. Wilkerson stated that while she did not know exactly how much Brad had to drink, there was only one can of beer left from the case and her grandson took it with him when they left.[1]

Later that evening, between 9:30 and 10:00 p.m., Gladys Wilkerson was driving her grandson back to her house, when he jumped out of her car as she was turning into her driveway, and went across the road to the Appellant's residence in order to see his former girlfriend, Dora Bailey, who was also the Appellant's stepdaughter. Once inside the residence, Ms. Bailey testified that Brad was staggering, drunk and rowdy. She stated that she offered to mend the cut over Brad's eye, which he had sustained earlier in the day. They proceeded to the bathroom for this purpose, and Ms. Bailey testified that while they were in the bathroom, Brad made improper advances to her and proceeded to grab her breast. Ms. Bailey scolded him and they returned to the living room. There was no evidence that Brad's advances were made known to anyone else in the residence at the time.

Next, Brad and the Appellant began arguing over Brad's dog, which happened to be a pit bull. According to Ms. Bailey and her brother, Mike Bailey, during the course of the argument, the Appellant threatened to kill Brad's dog. Ms. Bailey testified that the argument escalated and Brad acted like he was going to hit the Appellant. At that point, the Appellant "grabbed him [Brad] by the throat and shoved him and told him to get out." Instead of leaving as requested, Brad hit the Appellant, as well as Mike. Brad also threatened Mike's girlfriend, who was also present, stating "shut up, bitch, or I'll kick your ass too...." The Appellant

1. Gladys Wilkerson also testified that at some point during the afternoon while at Mr. May-

nard's, her grandson began shooting a rifle that recoiled and caused a cut above his eye.

and his stepson threw Brad out of the trailer several times, but he kept returning. The Appellant and his stepchildren testified that after Brad was thrown out of the house, he was banging on the front door, and yelling at the Appellant to "[c]ome outside and fight like a man you redheaded son-of-a-bitch" and "come outside[,] I'll kick all your all's asses."

During the altercation, Ms. Bailey called the police and told the Appellant that the police were on their way. Further, both the Appellant and Ms. Bailey yelled across the road for Brad's grandmother to come and get her grandson. According to Ms. Wilkerson, the Appellant yelled to her "[i]f you don't come down her and get this G.D. little son-of-a-bitch, ... I'm going to kill him." The Appellant then went to a bedroom to retrieve his gun.

When Brad's grandmother arrived, the Appellant and Brad were yelling at each other through a screen door, with Brad on the outside and the Appellant on the inside. Ms. Wilkerson told the Appellant to close the door and her grandson would go home with her. She testified that the Appellant did as she requested; however, after she and her grandson had taken only about five steps toward her house, the Appellant threw open the wooden door to the trailer and "yelled out again and said, your G.D. daddy is going to have to pay about a thousand dollars for this door." Brad turned around and once again returned to the Appellant's house. Ms. Wilkerson testified that at no time did she witness Brad banging on the Appellant's door. She once again asked the Appellant to close the door. Ms. Wilkerson stated that right after the Appellant complied with her request, the Appellant fired a shot through the door that struck Brad in the eye. According to Ms. Wilkerson, at the time her grandson was shot, he was not standing on the steps leading to the Appellant's door, but rather was about a foot away from the steps.

Moreover, she did not hear him threaten either the Appellant or his family prior to being shot.

The evidence established that prior to the shot witnessed by Ms. Wilkerson, the Appellant had already fired a shot once in the bottom of the screen door in an attempt to scare Brad away from the door. The Appellant testified that he told Brad to go home five or six more times after firing the warning shot and then closed the wooden door upon Ms. Wilkerson's request.[2] The Appellant testified that while Brad was banging on the door, he shot again, this time aiming "kind of high" at the wooden door because he "was going to try and just scare him and never dreamed it would hit him." The Appellant testified that he fired this second shot out of his concern that if Brad were to gain reentry into his home, "he was going to hurt me, and I didn't want to be hurt. I was scared of him." The Appellant expressed this concern even with the knowledge that the police were en route and even though Brad was drunk to the point of staggering and had no weapons. The second bullet went through the door and hit Brad, who was standing outside the door, in the left eye.[3] Brad later died from this wound.

## II.

The first issue is whether the trial court erred in denying the Appellant's motion for judgment of acquittal. The Appellant argues that a review of the evidence clearly indicates that the jury's verdict was contrary to the evidence and that the State's evidence was insufficient to convince impartial minds of the Appellant's guilt beyond a reasonable doubt. The Appellant asserts that the evidence produced at trial clearly shows that he was not the aggressor and that he, along with others in the home, were placed in fear of imminent danger of death or serious bodily injury from

**2.** The Appellant's testimony conflicted with Ms. Wilkerson's in that she only testified to one shot being fired while outside the Appellant's home, whereas the Appellant indicated that she was present when both shots were fired.

**3.** The evidence was conflicting as to whether Brad was standing on the steps or at the foot of the steps when this shot was fired. Deputy Sher-

iff Carl Douglas Dancy, the investigating officer opined, however, that based on measurements he took at the crime scene and the trajectory of the bullet that entered Brad's head, "if anyone had been standing on those steps when that round exited that door, it should have struck them somewhere below where the injury was sustained."

the victim.[4] Further, the Appellant contends that the only evidence presented by the State that the victim was not an unlawful intruder threatening the occupants of his home was provided by the testimony of the victim's grandmother, Ms. Wilkerson. The Appellant maintains that her testimony was so incredible that it should not have been considered. In contrast, the Appellee asserts that there was ample evidence to permit a reasonable jury to find the Appellant guilty of involuntary manslaughter beyond a reasonable doubt.

We recently addressed the standard of review for sufficiency of the evidence in syllabus points one and three of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), where we stated:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent our prior cases are inconsistent, they are expressly overruled.

*Id.* at 663, 461 S.E.2d at 169.

Keeping these principles in mind, we now examine the elements of the crime of involuntary manslaughter and the defense of self-defense, which was relied upon by the Appellant, before reviewing the evidence to determine whether "any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." *Id.* at Syl.Pt. 1. In *State v. Hose*, 187 W.Va. 429, 419 S.E.2d 690 (1992), we stated that " '[t]he offense of involuntary manslaughter is committed when a person, while engaged in an unlawful act, unintentionally causes the death of another, or where a person engaged in a lawful act, unlawfully causes the death of another.' " *Id.* at 432, 419 S.E.2d at 693 (quoting Syl.Pt. 7, *State v. Barker*, 128 W.Va. 744, 38 S.E.2d 346 (1946); *accord State v. Vollmer*, 163 W.Va. 711, 712, 259 S.E.2d 837, 839 (1979). Further, we stated that "something more than ordinary negligence is required to sustain an involuntary manslaughter conviction[.]" *Hose*, 187 W.Va. at 432, 419 S.E.2d at 693. Finally, we indicated that " 'reckless or wanton conduct of a nature calculated to cause injury to another should ... be considered as acting in an unlawful manner, however lawful that act might have been if per-

---

4. The Appellant argues that he retrieved his weapon for his own protection, as well as the protection of his family and home, only after the victim had sexually accosted his stepdaughter, instigated an argument, struck both him and his stepson, was forcibly ejected from his house, had continued to threaten those inside the home, and banged on the door. Interestingly, there was a lack of any evidence which indicated that the Appellant knew that the victim had made a sexual advance towards his stepdaughter. Moreover, his stepdaughter testified that while the advance made her angry, the two proceeded to engage in casual conversation after it occurred and before the argument began. Further, the Appellant neglects the fact that while the victim did throw punches, the Appellant responded by grabbing the victim by the throat and his stepson responded with punching the victim one or two times. Finally, the Appellant fails to address the fact that not only was the victim unarmed, but there was a lack of evidence which would tend to give the Appellant reason to believe that the victim was ever armed during the course of the altercation.

formed in a proper manner.'" *Id.* (quoting *State v. Lawson*, 128 W.Va. 136, 147–48, 36 S.E.2d 26, 31–32 (1945)).

■ Next, we review the elements of self-defense. Self-defense is generally defined as follows:

[A] defendant who is not the aggressor and has reasonable grounds to believe, and actually does believe, that he is in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant has the right to employ deadly force in order to defend himself.

*State v. W.J.B.*, 166 W.Va. 602, 606, 276 S.E.2d 550, 553 (1981). We further stated, however, that:

The occupant of a dwelling is not limited in using deadly force against an unlawful intruder to the situation where the occupant is threatened with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the commission of a felony and the occupant reasonably believes deadly force is necessary.

*Id.* at 609, 276 S.E.2d at 554. Moreover, "the reasonableness of the occupant's belief and actions in using deadly force must be judged 'in the light of the circumstances in which he acted at the time and is not measured by subsequently developed facts.'" *Id.* at 612, 276 S.E.2d at 556 (quoting *State v. Reppert*, 132 W.Va. 675, 691, 52 S.E.2d 820, 830 (1949)).

■ A review of the record indicates that the State presented sufficient evidence from which the jury could have concluded that the Appellant was guilty of involuntary manslaughter beyond a reasonable doubt. The Appellant, after having threatened to kill the victim, admitted that he shot through a closed door towards the victim, while believing that the victim was standing on the steps outside that door and knowing that the victim was unarmed. Moreover, it was undisputed that the shot fired by the Appellant resulted in the victim's death. Thus, the State established that the Appellant acted in an unlawful manner when he engaged in reckless conduct which caused injury to another. *See Hose*, 187 W.Va. at 432, 419 S.E.2d at 693 (quoting *Lawson*, 128 W.Va. at 147–48, 36 S.E.2d at 31–32). Further, the undisputed evidence indicated that the jury could have concluded that the victim was not an unlawful intruder in the Appellant's home on the evening the shooting occurred.[5] Moreover, even if the victim became an unlawful intruder at the time he was thrown out of the Appellant's home and kept returning, the evidence unequivocally demonstrated that at the time the Appellant shot the victim, the victim was outside the Appellant's home, with the front door closed. With the victim outside the house without any guns or weapons and with the police on their way, a jury quite easily could have decided that the Appellant's fear of imminent physical violence or serious bodily injury was unreasonable. Finally, the victim was intoxicated to the point of staggering, which a rational jury

---

**5.** The Appellant argues that "[t]he only evidence presented by the State that Mr. Wilkerson was not an unlawful intruder threatening the occupants of Mr. Hughes' home was that of his grandmother ... [and her] testimony is so incredible as to be impossible ... [and, therefore,] should not be considered." The Appellant bases his argument on the fact that testimony offered by Ms. Wilkerson concerning where the victim was standing at the time of the killing conflicted with that offered by Deputy Dancy, as well as physical evidence at the crime scene. Ms. Wilkerson testified that her grandson was standing one to one and one-half feet from the bottom of the steps, while the deputy testified, based upon measurements taken at the scene, that the victim was standing 10 to 21 inches from the door on the steps.

We stated in *Guthrie* that

[a]n appellate court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact. It is for the jury to decide which witnesses to believe or disbelieve. Once the jury has spoken, this Court may not review the credibility of the witnesses.

194 W.Va. at 669, 461 S.E.2d at 175 n. 9 (citation omitted). Consequently, we find no merit to the Appellant's allegation. The jury heard the testimony of both witnesses and simply gave more weight to that of the grandmother, who was an eyewitness to the events, as opposed to the deputy who was offering an opinion based on measurements taken after the fact.

could have perceived as reducing the threat of his ability to do serious bodily injury.

After reviewing the evidence in the light most favorable to the State, we conclude that it was sufficient for a rational jury to have found that the State proved the essential elements of voluntary manslaughter beyond a reasonable doubt. *See* Syl.Pt. 1, *Guthrie*, 194 W.Va. at 663, 461 S.E.2d at 169. Having determined that sufficient evidence exited for the Appellant's conviction, we conclude that the trial court committed no error in denying the Appellant's motion for acquittal.

### III.

The next issue is whether the trial court erred in denying the Appellant's motion seeking credit against his sentence for time served upon home confinement as a condition of bail pending trial.[6] The Appellant, after initially being incarcerated in the Fayette County Jail, was granted bail, after a hearing.[7] The order granting bail, dated September 30, 1993, set the amount of bail at $60,000, and placed the following conditions upon the Appellant's bond:

> the defendant shall not use alcohol and shall not frequent any places where alcohol is used or consumed. The defendant shall further be confined to his home at all times except to go to and from his place of employment;[8] to and from medical providers; and to and from his attorney's office. Further, the defendant shall have no contact whatsoever with the alleged victim's family during the pendency of this proceeding, unless accompanied by his attorney. (Footnote added).

The Appellant argues that the Home Confinement Act ("Act"), West Virginia Code §§ 62–11B–1 to –12 (1993), provides that as a condition of bail, a circuit court may order an offender confined to the offender's home for a period of home incarceration. W.Va.Code § 62–11B–4(a) (1993).[9] The Appellant asserts, however, when this occurs, the aggregate time actually spent in home incarceration may not exceed the term of imprisonment or incarceration for the offense committed. *Id.* § 62–11B–4(b). Thus, the Appellant contends that his maximum exposure of incarceration in this matter cannot exceed one year by law, and yet, he has been incarcerated in the Fayette County Jail or on home confinement since August 21, 1993. In contrast, the State argues that the Appellant was not subject to statutory or de facto home confinement, but was granted bail subject to restrictions pursuant to West Virginia Code § 62–1C–2 (1992)[10] and, therefore, is not entitled to

---

6. The Appellant only assigns as error the lower court's denial of credit for time served in home confinement while he was awaiting trial. Since the Appellant does not allege that the lower court denied him post-trial credit for time served in home confinement, we need not address that issue at this time.

7. After his conviction, the Appellant was re-released on bond with the same terms and conditions as previously set by the court. The Appellant is currently out on bond with the same conditions, pending this Court's decision.

8. The condition of home confinement was set at the State's request.

9. Because the Appellant was granted bail in August 1993, we defer to the 1993 version of the Home Confinement Act ("Act"), West Virginia Code §§ 62–11B–1 to –12 (1993). In 1994, the legislature amended the Act by " 'redesignating references to the words "confinement" and "detention" as the word "incarceration" ' " *State v. Lewis*, 195 W.Va. 282, 285, 465 S.E.2d 384, 387 n. 4 (1995) (quoting Preamble, S.B. 263, 71st Leg., 2nd Reg.Sess., 1994 W.Va.Laws Chap. 41,

p. 180). Accordingly, the amended Act is referred to as the "Home Incarceration Act." *See* W.Va.Code § 62–11B–1 (1994). There were no other material changes to the Act arising out of the 1994 amendments.

10. West Virginia Code § 62–1C–2, provides, in pertinent part:

> Bail is security for the appearance of a defendant to answer to a specific criminal charge before any court or magistrate at a specific time or at any time to which the case may be continued. It may take any of the following forms:
> (a) The deposit by the defendant or by some other person for him of cash.
> (b) The written undertaking by one or more persons to forfeit a sum of money equal to the amount of the bail if the defendant is in default for appearance, which shall be known as a recognizance.
> (c) Such other form as the judge of the court that will have jurisdiction to try the offense may determine.
> *Id.*

credit for time served during his pre-trial bail period.

■ The crux of the Appellant's argument is that since he has been subjected to home confinement as a condition of pre-trial bail, he is entitled to have the time spent under home confinement applied toward his one year sentence for involuntary manslaughter as credit for time served.[11] To support his argument, the Appellant relies on our decision in *State v. Long*, 192 W.Va. 109, 450 S.E.2d 806 (1994), where we stated that "[w]hen the legislature initially adopted the home confinement statute, it stated that it was '... another form of incarceration ...,'" for an offender. *Id.* at 111, 450 S.E.2d at 808. The Appellant's reliance on the *Long* decision,[12] however, is premised on the assumption that the circuit court, in the present case, required home confinement as a condition of his pretrial release under the provisions of the Act,[13] as opposed to making home confinement a condition of bail as provided for under West Virginia Code § 62–1C–2. Thus, it becomes necessary to examine the pertinent statutory provisions in order to determine which statute governs the Appellant's situation.

## A. THE HOME CONFINEMENT ACT

■ It is undeniable that the Act provides that home confinement can be a condition of bail, as reflected in the following language of West Virginia Code § 62–11B–4(a): "As a condition of probation or bail or as an alternative sentence to another form of incarceration for any criminal violation of this code over which a circuit court has jurisdiction, a circuit court may order an offender confined to the offender's home for a period of home confinement." *Id.* Further, where home confinement is ordered, "[t]he period of

home confinement may be continuous or intermittent, as the circuit court orders...." However, the aggregate time actually spent in home confinement may not exceed the term of imprisonment or incarceration prescribed by this code for the offense committed by the offender. *Id.* § 62–11B–4(b). Clearly evident from this statutory provision is that it only applies to an "offender." The term "offender" is defined in West Virginia Code § 62–11B–3 as "any adult convicted of a crime punishable by imprisonment or detention in a county jail or state penitentiary; or a juvenile convicted of a delinquent act that would be a crime punishable by imprisonment or incarceration in the state penitentiary or county jail, if committed by an adult." *Id.* Therefore, it is apparent that the legislative intent was for this statutory provision, including the imposition of bail, to be used only in post-conviction situations.

Further indicia that the Act applies only to offenders is presented by the numerous restrictions that a circuit court is statutorily mandated to impose on an individual who is granted home confinement under the Act. Specifically, West Virginia Code § 62–11B–5, in pertinent part, dictates that a circuit court include certain requirements in its order granting home confinement as noted in following statutory language:

An order for home detention of an offender under section four [§ 62–11B–4] of this article shall include, but not be limited to, the following:

(1) A requirement that the offender be confined to the offender's home at all times except when the offender is:

(A) Working at employment approved by the circuit court or magistrate, or traveling to or from approved employment;

---

11. It is well-settled that "under the Double Jeopardy and Equal Protection Clauses of the West Virginia Constitution, Article III, Sections 10 and 17, time spent in jail either pre-trial or post-trial, shall be credited on the sentence." *Martin v. Leverette*, 161 W.Va. 547, 551, 244 S.E.2d 39, 42 (1978). That principle, however, is inapplicable where an individual has not been subject to incarceration or the equivalent thereof.

12. In relying on *Long*, the Appellant ignores the fact that in *Lewis*, we distinguished the *Long*

decision on the fact that it "did not deal with home confinement vis-a-vis the probation statute...." 195 W.Va. at 288, 465 S.E.2d at 390 n. 11. Because the present case deals with home confinement as a condition of pre-trial bail, we conclude, as we did in *Lewis*, that *Long* is distinguishable. *See id.* at 288, 465 S.E.2d at 390 n. 11.

13. *See supra* note 9.

(B) Unemployed and seeking employment approved for the offender by the circuit court or magistrate;

(C) Undergoing medical, psychiatric, mental health treatment, counseling or other treatment programs approved for the offender by the circuit court or magistrate;

(D) Attending an educational institution or a program approved for the offender by the circuit court or magistrate;

(E) Attending a regularly scheduled religious service at a place of worship;

(F) Participating in a community work release or community service program approved for the offender by the circuit court[ ], in circuit court cases; or

(G) Engaging in other activities specifically approved for the offender by the circuit court or magistrate.

(2) Notice to the offender of the penalties which may be imposed if the circuit court or magistrate subsequently finds the offender to have violated the terms and conditions in the order of home detention.

(3) A requirement that the offender abide by a schedule, prepared by the probation officer in circuit court cases; or by the supervisor or sheriff in magistrate court cases, specifically setting forth the times when the offender may be absent from the offender's home and the locations the offender is allowed to be during the scheduled absences.

(4) A requirement that the offender is not to commit another crime during the period of home confinement ordered by the circuit court or magistrate.

(5) A requirement that the offender obtain approval from the probation officer or supervisor or sheriff before the offender changes residence or the schedule described in subdivision (3) of this section.

(6) A requirement that the offender maintain:

(A) A working telephone in the offender's home;

(B) If ordered by the circuit court or as ordered by the magistrate, an electronic monitoring device in the offender's home, or on the offender's person, or both; and

(C) Electric service in the offender's home if use of a monitoring device is ordered by the circuit court or anytime home confinement is ordered by the magistrate.

(7) A requirement that the offender pay a home confinement fee set by the circuit court or magistrate....

(8) A requirement that the offender abide by other conditions set by the circuit court or by the magistrate.

*Id.* § 62–11B–5. Finally, an offender is entitled to credit for time served on home confinement if he violates the terms and conditions of the lower court's home confinement order. *See* W.Va.Code § 62–11B–9.

Reflected in the above-mentioned statutory provisions is the intent of the legislature for the Act to be penal in nature. As we previously stated in *Long,*

[t]he entire statutory scheme indicates that home confinement is designed to place substantial restrictions on the offender. A violation of these restrictions results in the offender being subject to incarceration under the penalties prescribed for the crime. The penal nature of home detention is recognized under W.Va.Code § 62–11B–9(b), as it provides credit for time spent in home confinement towards the imposition of any sentence following a violation of home confinement.

192 W.Va. at 111, 450 S.E.2d at 808 (footnote and citation omitted); *see State v. Lewis,* 195 W.Va. 282, 285, 465 S.E.2d 384, 387 (1995) (referring to penal nature of Act in stating that "[t]he imposition of a *sentence* of home incarceration is governed by the Home Incarceration Act") (emphasis added). Accordingly, due to the penal nature of the Act, when a circuit court, in its discretion, orders an offender confined to his home as a condition of bail, the offender must be an adult convicted of a crime punishable by imprisonment or detention in a county jail or state penitentiary or a juvenile adjudicated guilty of a delinquent act that would be a crime punishable by imprisonment or incarceration in the state penitentiary or county jail, if committed by an adult.

## B. BAIL

In contrast to home confinement under the Act, the purpose of pre-trial bail is

not to punish, but rather it acts as "security for the appearance of a defendant to answer to a specific criminal charge before any court or magistrate at a specific time or at any time to which the case may be continued." W.Va.Code § 62–1C–2; *see State ex rel. Ghiz v. Johnson*, 155 W.Va. 186, 189, 183 S.E.2d 703, 705 (1971) (citing *Carr v. Sutton*, 70 W.Va. 417, 420–21, 74 S.E. 239, 240 (1912)). Consequently, a person need not be convicted of a crime [14] in order for bail to be granted as reflected in the following language of West Virginia Code § 62–1C–1(a):

> A person arrested for an offense not punishable by life imprisonment shall be admitted to bail by the court or magistrate. A person arrested for an offense punishable by life imprisonment may, in the discretion of the court that will have jurisdiction to try the offense, be admitted to bail.

*Id.* Further, a circuit court is afforded great latitude in formulating bail, as the court may require that bail be in the form of a deposit, a recognizance, or "[s]uch other form as the judge of the court that will have jurisdiction to try the offense may determine." *Id.* § 62–1C–2. Absent from the statutory scheme regarding bail,[15] however, are the numerous mandatory restrictions that must be imposed upon an individual granted home confinement under the Act due its penal nature. *See* W.Va.Code § 62–11B–5. The absence of substantial restrictions indicates that bail, even with a home confinement restriction, is not the equivalent of incarceration.

▮ Therefore, when a person who has been arrested, but not yet convicted of a crime, is admitted to pre-trial bail with the condition that he be restricted to home confinement pursuant to West Virginia Code § 62–1C–2(c), the home confinement restriction is not considered the same as actual confinement in a jail, nor is it considered the same as home confinement under the Act. Therefore, the time spent in home confinement when it is a condition of bail under West Virginia Code § 62–1C–2(c) does not count as credit toward a sentence subsequently imposed.

It is apparent in the instant case that at the time the Appellant was granted bail conditioned upon home confinement he was not an "offender" within the meaning of the statute, since he had not been convicted of the crime charged. Even the trial judge noted in the September 14, 1994, sentencing hearing that the Act, by its definition, applied to offenders convicted of a crime and that he could not understand how it could apply to the Appellant's pre-trial bail since he had not been convicted of any charges at the time home confinement was imposed. Since the Appellant was not an "offender" at the time home confinement was imposed, the provisions of the Act are inapplicable to him and he is not entitled to any credit for time served under the provisions of the Act. *See* W.Va.Code § 62–11B–4; *see generally Lewis*, 195 W.Va. at 288–89, 465 S.E.2d at 390–91 (holding that "under the probation statute, home incarceration is not considered the same as actual confinement in a county jail. Therefore, the time spent in home incarceration as a condition of pre-trial bail does not necessarily count toward the one-third time of the minimum sentence, which can be ordered under the probation statute as a condition for probation") (citation omitted). Moreover, the lack of the mandatory statutory requirements that the circuit court is required to place in the order allowing for home detention is further indicia that not only was the Appellant not subject to the numerous restrictive burdens the Act intended to be placed upon an offender, but also that the circuit court was not utilizing the provisions of the Act when it placed the Appellant on home confinement as a condition of pre-trial bail pursuant to West Virginia Code § 62–1C–2(c). *Cf.* W.Va.Code § 62–11B–4.

Based on the foregoing, the decision of the Circuit Court of Fayette County is hereby affirmed.

Affirmed.

---

14. A convicted person may also be admitted to bail pursuant to West Virginia Code § 62–1C–1(b).

15. *See* W.Va.Code §§ 62–1C–1 to –19 (1992 and Supp.1995).