IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 23-277

_____

FILED

March 25, 2025

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

CORBETT MAURICE CARTER,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Raleigh County
The Honorable Andrew G. Dimlich, Judge
Case No. CC-41-2022-F-164

AFFIRMED

_____

Submitted: January 14, 2025
Filed:  March 25, 2025

Matthew D. Brummond, Esq.
Olivia M. Lee, Esq.
Charleston, West Virginia
Counsel for Petitioner

John B. McCuskey, Esq.
Attorney General
Mary Beth Niday, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

ACTING CHIEF JUSTICE BUNN dissents and reserves the right to file a separate opinion.

JUSTICE WOOTON disqualified.

JUDGE SORSAIA sitting by temporary assignment.

JUSTICE TRUMP disqualified.

JUDGE AKERS sitting by temporary assignment.

SYLLABUS BY THE COURT

1. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

2. "'Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.' Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)." Syllabus Point 1, *State v. Cottrill*, 204 W. Va. 77, 511 S.E.2d 488 (1998).

3. "Courts always endeavor to give effect to the legislative intent, but a statute that is clear and unambiguous will be applied and not construed." Syllabus Point 1, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968).

4.      "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation."  Syllabus Point 2, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968).

5.      When an individual charged with a felony or a misdemeanor is placed on home incarceration as a condition of pretrial bond or bail, that individual is in "custody" for purposes of the escape statute, West Virginia Code § 61-5-10 (2000).

WALKER, Justice:

While Petitioner Corbett Maurice Carter was on home incarceration with electronic monitoring as a condition of pretrial bond, he left the home in which he was ordered to remain, cut his electronic monitoring bracelet, and disposed of it in a dumpster. Following his eventual apprehension, he was convicted of felony escape. On appeal, Mr. Carter argues that he was not in custody from which he could escape while on home incarceration imposed as a condition of pretrial bond and that the evidence, therefore, was insufficient to support his conviction. Because we now hold that an individual placed on home incarceration as a condition of bond is in "custody" for purposes of West Virginia Code § 61-5-10 (2000), we disagree and affirm his conviction for felony escape.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In late 2021, Mr. Carter was charged with first-degree robbery, a felony. While awaiting trial on that charge, Mr. Carter was placed on bond and, as a condition of his bond, on home incarceration with electronic monitoring. Shortly after his placement on home incarceration, Mr. Carter cut the strap of his monitoring device, left his home, and threw the monitoring device away in a dumpster. Mr. Carter was later arrested, and on February 4, 2022, he was indicted on one count of felony escape.

Mr. Carter was tried on his escape charge on February 14, 2023. The State called two witnesses to testify—the Raleigh County Magistrate Clerk and Corporal Patrick

Vance, of the Raleigh County Sheriff's Office. Through the Magistrate Clerk, the "Order Requiring Home Incarceration As Condition of Bond" was introduced into evidence. The bond order directs that Mr. Carter "shall remain at his approved residence," that the Home Incarceration Division of the Raleigh County Sheriff's Office perform the supervision of Mr. Carter, and that Mr. Carter "shall cooperate with the Home Incarceration Officer and abide by all rules and regulations promulgated by the Home Incarceration Office." The bond order includes a place for Mr. Carter's signature if he "read and underst[oo]d the foregoing terms and conditions of [his] home incarceration, and agree[d] with the [c]ourt to accept them and pledge[d] that [he] will abide by them." Mr. Carter's signature is on the bond order.

Corporal Vance testified that he is assigned to the Home Incarceration Division of the Raleigh County Sheriff's Office, that he is generally responsible for monitoring and supervising individuals placed on home incarceration, and that he supervised Mr. Carter specifically. In line with his responsibilities, Corporal Vance explained that he reviewed with Mr. Carter the various rules with which he was required to comply while on home incarceration. Those rules, set forth in the "Agreement to Comply With Rules of Supervision," were entered into evidence and contain Mr. Carter's signature. As he did in the bond order, Mr. Carter agreed that he "must remain at [his] approved residence," and he understood that while on home incarceration he "shall be confined to the interior of [his] residence except for pre-approved schedules and emergency

2

situations." The rules by which he agreed to abide also warned that "if [he] l[eft] [his] residence without permission, fail[ed] to return at [his] scheduled time or deviate[d] in any manner from [his] approved schedule [he] may be charged with the crime of 'Escape'." Corporal Vance testified that Mr. Carter was subject to around-the-clock electronic monitoring, and that Mr. Carter wore a bracelet on which a GPS monitor was affixed. The bracelet contained a circuit, and if that circuit was cut or otherwise disconnected, Corporal Vance would receive an alert.

Corporal Vance testified that on February 4, 2022, he received that alert, indicating that Mr. Carter had cut his electronic monitoring bracelet. The State introduced a map of Mr. Carter's movements surrounding the time his bracelet was cut. According to Corporal Vance, the map showed that Mr. Carter "left his house without being scheduled. [The tracked movement reflected on the map] turns yellow for a grace period. Once it turns red, he's in violation. At the point that is marked on the map, that's where he cut the strap, threw it into a dumpster." Corporal Vance testified that he retrieved the bracelet and GPS monitor from the dumpster, and he described that the bracelet had been cut.

Following Corporal Vance's testimony, the State rested. The defense rested without putting on evidence. The jury found Mr. Carter guilty of felony escape. On May 3, 2023, Mr. Carter returned for sentencing, and the circuit court imposed a three-year determinate sentence. Mr. Carter now appeals from the court's April 19, 2023, order memorializing that sentence.

## II.   STANDARD OF REVIEW

On appeal, Mr. Carter argues that the evidence was insufficient to support his conviction because "absconding" home incarceration, when it is imposed as a condition of pretrial bond, does not constitute "escape." Specifically, Mr. Carter's argument implicates an evidentiary deficiency in the element of "custody." In reviewing challenges to the sufficiency of the evidence to support a conviction,

> [t]he function of an appellate court . . . is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.[1]

Mr. Carter's argument is not that there was insufficient evidence to show that he had been placed on home incarceration as a condition of pretrial bond; rather, he contends that home incarceration as a condition of pretrial bond does not, as a matter of law, constitute "custody." Therefore, we must consider the relevant statutory language, and so our review is de novo: "'Where the issue on an appeal from the circuit court is clearly a question of

---

[1] Syl. Pt. 1, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

4

law or involving an interpretation of a statute, we apply a *de novo* standard of review.'

Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995)."[2]

## III. ANALYSIS

Mr. Carter was convicted of violating the escape statute, West Virginia Code

§ 61-5-10 (2000), which provides, in relevant part, that

> [w]hoever escapes or attempts to escape by any means from the custody of a county sheriff, the director of the regional jail authority, an authorized representative of said persons, a law-enforcement officer, probation officer, employee of the division of corrections, court bailiff, or from any institution, facility, or any alternative sentence confinement, by which he or she is lawfully confined, if the custody or confinement is by virtue of a charge or conviction for a felony, is guilty of a felony and, upon conviction thereof, shall be confined in a correctional facility for not more than five years . . . .

In his lone assignment of error, Mr. Carter argues that when he cut his monitoring bracelet

and left his home, he violated a bond condition, but he did not violate West Virginia Code

§ 61-5-10 (2000).  Mr. Carter acknowledges that in *State v. McGann*[3] we resolved this very

issue against the position he advances, but he argues that *McGann* was wrongly decided,

and he offers three reasons why home incarceration as a condition of pretrial bond does not

come within the escape statute's reach.

---

[2] Syl. Pt. 1, *State v. Cottrill*, 204 W. Va. 77, 511 S.E.2d 488 (1998).

[3] No. 20-0329, 2021 WL 4936282 (W. Va. Sept. 27, 2021) (memorandum decision).

First, Mr. Carter argues that he was not in "custody" as used in the escape statute because release on bond constitutes a release from custody. Mr. Carter looks to Rule 46 of the West Virginia Rules of Criminal Procedure, which is titled "Release from custody" and describes the procedure for various release scenarios, including "release prior to trial."[4] He also cites to Black's Law Dictionary's definition of "bail bond," which provides that "[t]he effect of the release on bail bond is to transfer custody of the defendant from the officers of the law to the surety on the bail bond, whose undertaking is to redeliver the defendant to legal custody at the time and place appointed in the bond."[5]

Second, Mr. Carter notes that the escape statute was amended in 1995 to add "alternative sentence confinement" to the types of confinement from which one can escape.[6] Mr. Carter claims that this evidences the Legislature's intent to bring only home incarceration imposed as an "alternative sentence" within the escape statute's reach, not home incarceration imposed as a condition of pretrial bond, and as his home incarceration was not an "alternative sentence confinement," he could not have escaped from it.

---

[4] Under the portion of Rule 46 related to pretrial release, the rule provides that "[e]ligibility for release prior to trial shall be in accordance with Chapter 62, Article 1C, Section 1 of the West Virginia Code of 1931, as amended," which describes the right to bail, exceptions to that right, and summary bail petitions.

[5] *Bail bond*, *Black's Law Dictionary* (12th ed. 2024).

[6] *Compare* W. Va. Code § 61-5-10 (1994) *with id.* (1995).

Third, Mr. Carter asserts that this Court has differentiated pretrial home incarceration from postconviction home incarceration in determining whether someone is entitled to credit for time served on home incarceration.[7] In short, we have previously said that home incarceration as a condition of pretrial bail is not "the same as actual confinement in a jail, nor is it considered the same as home [incarceration] under the Home [Incarceration] Act,"[8] an act that applies in the postconviction context,[9] so "the time spent in home [incarceration] when it is a condition of bail . . . does not count as credit toward a sentence subsequently imposed."[10] Mr. Carter maintains that because placement on home incarceration under the Home Incarceration Act—i.e., postconviction—is "punitive" and "penal,"[11] but placement on home incarceration as a condition of pretrial bond is not and merely acts as "security for the appearance of a defendant to answer to a specific criminal

---

[7] Notably, following our decision in *State v. McGuire*, 207 W. Va. 459, 533 S.E.2d 685 (2000), addressing when an offender is entitled to credit for time served on home incarceration as a condition of postconviction bail, the Legislature amended the Home Incarceration Act, "making it discretionary as to whether a circuit court grants credit to an offender for time spent on home incarceration as a condition of bail." *State v. Jedediah C.*, 240 W. Va. 534, 539, 814 S.E.2d 197, 202 (2018).

[8] Syl. Pt. 4, in part, *State v. Hughes*, 197 W. Va. 518, 476 S.E.2d 189 (1996).

[9] *See* W. Va. Code § 62-11B-2 (1994) (providing that, as related to adults, the Home Incarceration Act "applies to adult offenders"); *id.* § 62-11B-3(3) (2001) (defining "[o]ffender" to mean "any adult convicted of a crime punishable by imprisonment or detention in a county jail or state penitentiary").

[10] *Hughes*, 197 W. Va. at 521, 476 S.E.2d at 192, Syl. Pt. 4, in part.

[11] *Id.* at 520, 476 S.E.2d at 191, Syl. Pt. 3, in part (describing the "penal nature" of the Home Incarceration Act).

7

charge,"[12] the latter placement is not "custody," as used in the escape statute. Only when home incarceration is imposed under the Home Incarceration Act, Mr. Carter extrapolates, is it sufficiently "incarcerative" to be considered "custody" from which someone can escape.

In analyzing a statute, we "always endeavor to give effect to the legislative intent, but a statute that is clear and unambiguous will be applied and not construed."[13] And "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation."[14] Of course, there may be "instances, such as the present one, where the language used by the Legislature may be plain but where it has failed to define a certain word or phrase."[15] Where that is the case, words are given their "common, ordinary and accepted meaning."[16]

---

[12] *Id.* at 527-28, 476 S.E.2d at 198-99 (quoting W. Va. Code § 62-1C-2)).

[13] Syl. Pt. 1, in part, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968).

[14] *Id.* at 571, 165 S.E.2d at 109, Syl. Pt. 2.

[15] *State v. Sulick*, 232 W. Va. 717, 724, 753 S.E.2d 875, 882 (2012).

[16] *Id.* (quoting Syl. Pt. 1, *Miners in Gen. Grp. v. Hix*, 123 W. Va. 637, 17 S.E.2d 810 (1941)); *see also* Syl. Pt. 6, in part, *State ex rel. Cohen v. Manchin*, 175 W. Va. 525, 336 S.E.2d 171 (1984) ("Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning.").

Despite recognizing that "[t]his case turns on the language of the felony escape statute," Mr. Carter makes every effort to avoid defining "custody"—the word used in the escape statute—by pointing to the Rules of Criminal Procedure adopted by this Court and offering the definition of words *not* used in the escape statute. But it is the Legislature's intent to which we are giving effect, and in doing that, where a statute is plain and unambiguous, as it is here, we look to the words chosen by the Legislature, giving them their commonly accepted meaning. Merriam-Webster defines "custody" as "immediate charge and control (as over a ward or a suspect) exercised by a person or an authority."[17] Black's Law Dictionary defines "custody" as "[t]he care and control of a thing or person for inspection, preservation, or security."[18] It also defines "constructive custody" as "[c]ustody of a person (such as a parolee or probationer) whose freedom is controlled by legal authority but who is not under direct physical control."[19]

Applying the common and ordinary meaning of "custody," it is evident that Mr. Carter was in the custody of the Raleigh County Sheriff and his authorized representative, Corporal Vance. The most substantial exercise of control was over where Mr. Carter went, requiring that he be confined to the interior of his home under threat of

---

[17] *Custody*, Merriam-Webster, https://www.merriam-webster.com/dictionary/custody?src=search-dict-box (last visited Jan. 24, 2025).

[18] *Custody*, *Black's Law Dictionary* (12th ed. 2024).

[19] *Constructive custody*, *Black's Law Dictionary* (12th ed. 2024).

the very charge he claims he was not subject to. But as Mr. Carter clearly acknowledged and agreed, he was also required to (1) permit Corporal Vance to visit his home "at any time, announced or unannounced"; (2) "faithfully cooperate with the Home Incarceration Office, answer fully and truthfully any inquiry made of [him] and . . . comply with any instruction or direction given . . . during [his] period of supervision; (3) cooperate with Corporal Vance and abide by all rules and regulations promulgated by the Home Incarceration Office of the Raleigh County Sheriff's Office; (4) prohibit "persons of disreputable character" from visiting his home; (5) submit to random drug and alcohol tests at Corporal Vance's discretion; (6) not possess firearms; (7) not consume or possess alcohol; and (8) maintain a working phone. Mr. Carter also understood that the home incarceration office "must be able to locate [him] at all times," and Corporal Vance outfitted him with an electronic monitor for that purpose and to assist Corporal Vance with fulfilling the supervisory duties imposed upon him. Without question, the Raleigh County Sheriff exercised charge and control over Mr. Carter and nearly every aspect of his life while he was on home incarceration as a condition of pretrial bond, so we have no difficulty concluding that Mr. Carter was in "custody" for purposes of the escape statute.

We are not dissuaded from this conclusion by Mr. Carter's argument that the addition of "alternative sentence confinement" to the escape statute evidenced legislative intent to carve out pretrial home incarceration from the custody from which one can escape. We begin by noting that the changes made to the escape statute in 1995 were not limited

10

to adding "alternative sentence confinement."[20]  Rather, the changes were sweeping.  Prior to 1995, the statute provided, generally, that one could only escape from confinement in jail or private prison.[21]  But following the 1995 amendments, the statute included most of the individuals, entities, and scenarios from whose custody or confinement one can now escape.[22]  And in 2020, the escape statute was again amended to add "probation officer" and "employee of the division of corrections" to the list of individuals from whom one can escape.  These expansions include no intent to restrict the statute's application.  To the contrary, the statute is designed to cover a multitude of pretrial and postconviction custodial and confinement situations, including the various sentencing alternatives courts have at their disposal.[23]

We are likewise unpersuaded by Mr. Carter's arguments regarding credit for time served on home incarceration.  First, any distinction this Court has drawn between pretrial home incarceration and postconviction home incarceration based on the penal or punitive nature of the latter form of home incarceration does not support excluding the former form from the reach of the escape statute.  This is so because one can escape from

---

[20] *Compare* W. Va. Code § 61-5-10 (1994) *with id.* (1995).

[21] *See id.* (1994).

[22] *See id.* (1995).

[23] *See, e.g.*, W. Va. Code § 62-11A-1 (2018) (release for work and other purposes; enacted in 1972); 62-11A-1a (2020) (other sentencing alternatives; enacted in 1985).

custody or confinement imposed "by virtue of a charge."[24]  Plainly, application of the escape statute does not turn on whether the custody or confinement is punitive, as no punishment has been imposed at the charge stage.

Moreover, we observe that Mr. Carter's home incarceration *was* "pursuant to" the Home Incarceration Act.[25]  When Mr. Carter was charged with first-degree robbery and first appeared before a judicial officer, he was "entitled to be admitted to bail" subject to certain conditions that are "reasonably necessary" to ensure his appearance and protect the safety of people and evidence.[26]  "Further conditions" that may be imposed include the requirement that the person charged "[p]articipate in home incarceration *pursuant to* § 62-11B-1 *et seq.* of this code"—the Home Incarceration Act.[27]  So even under Mr. Carter's argument, he was in "custody" under the escape statute.  But if we ignore that Mr. Carter's home incarceration was "pursuant to" the Home Incarceration Act, we still find that his proposed reading of the escape statute clashes with the legislative intent to which we are bound to give effect.  In *State v. Allman*, we observed that "[t]he offense of escape is clearly designed to serve as deterrent to escape from lawful custody"; that "[e]scape statutes are 'intended to protect our jails from force and violence, and further to secure a holding of

---

[24] W. Va. Code § 61-5-10 (2000).

[25] *See id.* § 62-1C-1a(a)(2)(C) (2021).

[26] *Id.* § 62-1C-1a(a)(2).

[27] *Id.* § 62-1C-1a(a)(2)(C) (emphasis added).

those convicted of crimes until the day of their punishment"; and that there is "equal necessity of protecting those charged with confining [individuals charged with a crime] pending trial and providing a strong disincentive to those in custody to breach that custody."[28] As a result, there is no justification for encompassing within the escape statute postconviction home incarceration under the Home Incarceration Act but not pretrial home incarceration as a condition of bond, and we now hold that when an individual charged with a felony or a misdemeanor is placed on home incarceration as a condition of pretrial bond or bail, that individual is in "custody" for purposes of the escape statute, West Virginia Code § 61-5-10 (2000). *McGann*, therefore, was correctly decided, and just as we said about the petitioner in *Allman*, Mr. Carter "did not merely violate a condition of his home confinement; he breached the very confinement to which he was subject and, commensurately, the provisions of West Virginia Code § 61-5-10."[29] So we affirm Mr. Carter's conviction for felony escape.

## IV. CONCLUSION

For the reasons discussed above, we affirm the April 19, 2023, order of the Circuit Court of Raleigh County.

---

[28] 240 W. Va. 383, 389, 813 S.E.2d 36, 42 (2018).

[29] *Id.* at 390, 813 S.E.2d at 43.

13

.

Affirmed.